The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

**Rosten Lee CLARK, Defendant–Appellant.**

No. 07CA0157.

Colorado Court of Appeals, Div. II.

March 19, 2009.

Certiorari Granted Aug. 17, 2009.

John W. Suthers, Attorney General, Laurie A. Booras, First Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Cory D. Riddle, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

Defendant, Rosten Lee Clark, appeals the judgment of conviction entered on a jury verdict finding him guilty of one count of sexual assault. He also appeals his thirty-

two-years-to-life indeterminate sentence to the custody of the Department of Corrections (DOC). Defendant's most substantial contention is that the principal evidence against him, a DNA match of semen stains on articles of the victim's clothing she was not wearing at the time of the assault, is insufficient to sustain his conviction. We conclude that the evidence is sufficient and reject his other challenges to the conviction. However, because we agree that the sentence exceeds the maximum authorized by law, we vacate defendant's sentence and remand for resentencing.

An intruder confronted the victim in the early morning hours and sexually assaulted her in her bedroom. She was unable to provide police with more than a general description of her attacker. A medical examination found no evidence of semen in or on the victim's body or her bedclothes. Police subsequently removed over twenty items from the bedroom and sent them to the Colorado Bureau of Investigation (CBI) for forensic analysis.

CBI analysts found semen on both a sweatshirt and a headband recovered from the victim's bedroom. The sweatshirt had been near the bed before the assault, and the attacker used it to cover the victim's head after the assault. The headband was recovered from the bedroom floor in the vicinity of where the assault occurred. The victim had not been wearing either item at the time of the attack. Analysts constructed a DNA profile for the individual who had deposited the semen and checked it through the Combined DNA Index System (CODIS) (a nationwide database of DNA profiles obtained from persons convicted of various offenses). *See* 42 U.S.C. § 14132 (establishing index of DNA identification records); *ABA Standards for Criminal Justice: DNA Evidence* intro., at 17 (3d ed.2007). The CBI eventually obtained a CODIS match linking defendant to the crime scene DNA.

Defendant was incarcerated on an unrelated offense at the time the match was made. Authorities contacted him in prison, interviewed him, and obtained a blood sample. The sample matched the crime scene DNA profile, prompting the prosecution to charge defendant with one count of sexual assault under section 18–3–402(1)(a), C.R.S.2008 (a class 3 felony under section 18–3–402(4)(a), C.R.S.2008), and two counts of burglary under sections 18–4–202 & –203, C.R.S.2008.

The most significant evidence presented by the prosecution at trial to identify defendant as the perpetrator was the presence of his semen on the clothing found near the scene of the assault. Defendant testified that, before the assault, he and the victim's mother had engaged in consensual oral sex on multiple occasions, thus explaining the presence of his semen. The victim and her mother both testified that neither had ever had any form of consensual sexual contact with defendant, although he had been an invited guest in their home on several occasions. Additionally, the victim testified that she had purchased the sweatshirt on which defendant's semen was found only days before the attack, and that the price tag for that item was still attached.

The jury found defendant guilty. The trial court merged the two burglary counts with the sexual assault count, and sentenced him to thirty-two years to life in the custody of the DOC. This appeal ensued.

## I. Sufficiency of the Evidence

Defendant contends that the DNA match is the principal evidence linking him to the crimes, and it is insufficient to prove beyond a reasonable doubt that he was the perpetrator. We disagree.

### A. Standard of Review

When assessing the sufficiency of the evidence supporting a guilty verdict, we must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Sprouse*, 983 P.2d 771, 777 (Colo.1999). We give the prosecution the benefit of every reasonable inference that might be drawn from the evidence. *People v. McIntier*, 134 P.3d 467, 471 (Colo.App.2005). Additionally, the determination of the credibility of witnesses is solely within the province of the

fact finder, and we will not act as a thirteenth juror and set aside a verdict because we might have reached a different conclusion. *Id.* at 471–72.

## B. Evidentiary Standards

DNA evidence has obvious value to the criminal justice system. Countless criminals have been removed from the nation's streets and dozens of wrongfully convicted persons have been freed from its jails since the dawn of forensic DNA technology. *See ABA Standards for Criminal Justice: DNA Evidence* intro., at 18–19. Colorado courts have previously addressed the accuracy and admissibility of DNA evidence, *see, e.g., People v. Shreck,* 22 P.3d 68 (Colo.2001), but those issues are not argued here because defendant never contended that the DNA was not his.

Although DNA evidence has provided circumstantial evidence of identity for many years, its use as an exclusive means for proving the identity of the perpetrator in criminal cases is relatively rare. Several jurisdictions have held that DNA evidence alone may support a criminal conviction without further corroborative proof. In most of those cases, however, the crime scene DNA sample was taken from a location that effectively eliminated most innocent explanations for its presence. *See, e.g., State v. Freeman,* 269 S.W.3d 422, 425–26 (Mo.2008) (match between defendant and DNA collected from instrument of strangulation found around victim's neck sufficient to convict); *People v. Rush,* 165 Misc.2d 821, 630 N.Y.S.2d 631 (Sup.Ct.1995) (match between defendant and DNA collected from victim's anal and vaginal swabs sufficient to convict), *aff'd,* 242 A.D.2d 108, 672 N.Y.S.2d 362 (1998); *State v. Toomes,* 191 S.W.3d 122, 128–32 (Tenn.Crim. App.2005) (match between defendant and DNA collected from victim's anal swabs sufficient to convict).

We have found only one sexual assault case in which DNA obtained from a crime scene—rather than directly from a victim's person—was the primary identification evidence the prosecution proffered. *See People v. Soto,* 21 Cal.4th 512, 88 Cal.Rptr.2d 34, 981 P.2d 958, 960–62 (1999). However, in that case, the trial court also admitted evidence of "spontaneous utterances" by the victim, indicating her belief that the defendant was her assailant. *Id.* at 962. Additionally, it does not appear that the defendant there raised a sufficiency of the evidence argument on appeal.

We have found no Colorado authority on point; thus, whether crime scene DNA evidence, without further significant corroborative proof, is sufficient to identify the perpetrator and therefore sustain a criminal conviction is an issue of first impression in this state.

 The legal standards associated with the use of fingerprint identification provide a useful analytical model. *See Toomes,* 191 S.W.3d at 130 (finding fingerprint identification analogous and employing its framework to determine sufficiency). Our courts have long accepted that latent fingerprints are a corporeal signature of their maker, capable of conclusively identifying the individual who impressed them. *See Medina v. People,* 168 Colo. 255, 258, 450 P.2d 662, 664 (1969) (fingerprint "testimony" alone sufficient to support burglary conviction); *People v. Jennings,* 252 Ill. 534, 96 N.E. 1077 (1911) (one of the first United States cases admitting fingerprint evidence). But establishing that a fingerprint belongs to a particular person does not, by itself, prove that the person committed a particular crime. Courts have therefore established standards to ensure that fingerprint-based proof of identity is not conflated with proof of culpability. *See, e.g., People v. Ray,* 626 P.2d 167, 170–71 (Colo. 1981).

In *Ray,* the supreme court articulated the applicable analysis for assessing the sufficiency of evidence where an accused is tied to a crime by fingerprints alone:

It has been generally recognized that where, as here, the only evidence of guilt of accused persons consists of their fingerprints found at the scene of the crime, the evidence, to be legally sufficient to sustain a conviction, must be coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the prints were impressed at a time other than

that of the crime. (Citations omitted.) Such "other circumstances" need not be those completely independent of the fingerprint and may properly include circumstances such as the location of the print, the character of the place or premises where it was found and the accessibility of the general public to the object on which the print was impressed.

*Ray,* 626 P.2d at 170–71 (quoting with approval *Edmonds v. State,* 5 Md.App. 132, 141, 245 A.2d 618, 623 (1968)).

Thus, a defendant's fingerprints found inside a burglarized home, when coupled with testimony from the owners of the home that the defendant had never been an invited guest, were found sufficient to convict for second degree burglary and theft in *People v. Angel,* 701 P.2d 149, 151 (Colo.App.1985). However, a defendant's fingerprints found on the milk chute of a burglarized home, where the prosecution produced no evidence to prove when the prints were impressed, were deemed insufficient to support conviction in *Ray,* 626 P.2d at 171. *See also Solis v. People,* 175 Colo. 127, 128–29, 485 P.2d 903, 904 (1971) (defendant's fingerprint found on window glass broken during the burglary of a building, where the prosecution could not establish when it was left or whether it had come from the inside or outside of the window, deemed insufficient).

The lesson of both the *Ray* standard and the cases applying it is that to support a criminal conviction, physical evidence of fingerprint identification must be corroborated by additional evidence that the identified person was indeed the perpetrator of the crime. This so-called fingerprint evidence rule does not call for a special jury instruction and does not alter a jury's ability to weigh evidence. *See People v. Mandez,* 997 P.2d 1254, 1271 (Colo.App.1999). It does, however, mark the minimum requirements of evidentiary sufficiency for a case either to go to a jury or to survive appellate review. *Id.* We conclude that this requirement is as applicable to DNA evidence as it is to fingerprints.

However, the *Ray* standard cannot be applied to DNA evidence without modification. The raw material by which DNA profiles are constructed exists within every human cell. *Oxford Illustrated Companion to Medicine* 397 (Stephen Lock et al. eds., 3d ed.2001). Humans naturally and continuously shed hair and tissue cells that—as surely as fingerprints—serve as a signature of their identity. *Gray's Anatomy: The Anatomical Basis of Clinical Practice* 152 (Susan Standring ed., 40th ed.2008) (hair shedding is part of a recurrent cycle); DNA Initiative: Identifying DNA Evidence, http://dna.gov/basics/evidence_collection/identifying/ (last visited Feb. 11, 2009) (listing multiple sources of DNA evidence). Unlike fingerprints, however, these microscopic signatures can be left upon objects that have not been handled directly, and can be transferred by innumerable mechanisms into areas where their authors have scarcely traveled. *See* D.H. Kaye & Michael E. Smith, *DNA Identification Databases: Legality, Legitimacy, and the Case for Population–Wide Coverage,* 2003 Wis. L.Rev. 413, 435–36 (2003) (regarding shed DNA).

Human biology and common sense thus dictate that the evidentiary value of DNA obtained from a hair recovered in a public place is far different from that of DNA extracted from semen found in a private residence. Hence, where connection to a crime is established by DNA evidence alone, it is necessary to consider the type of biological material from which the crime scene DNA sample was obtained and its susceptibility to transfer by innocent means.

Guided by the *Ray* standard, we conclude that where, as here, the only direct evidence connecting an accused person to the crime is the presence of DNA at the scene of a crime, the evidence, to be legally sufficient to sustain a conviction, must be coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the DNA was deposited at a time other than that of the crime. Such other circumstances may include the source material of the DNA and its susceptibility to transfer, the location of the DNA, the character of the place or premises where it was found, the accessibility of that place or premises to the general public,

and the object upon which the DNA was found. *See Ray,* 626 P.2d at 170–71.

## C. The DNA Evidence

■ Here, defendant's semen was on a sweatshirt and headband recovered from the scene of the assault. The victim testified that she purchased the sweatshirt several days before the attack. If believed, her testimony thus provided the jury with a narrow window of time in which defendant's semen was likely deposited.

The sufficiency of the evidence here depends upon the nature of the biological material recovered, and the fact that it was found on an article of personal possession. Semen is neither deposited unintentionally nor transferred as readily as hair or tissue cells. Thus, there are only three possible explanations for the presence of defendant's semen on the victim's sweatshirt: (1) the semen was deposited before the victim acquired the sweatshirt, an argument defendant does not make here; (2) it was deposited during consensual sexual activity; or (3) it was deposited during nonconsensual sexual activity.

Defendant testified that his semen was deposited during consensual oral sex with the victim's mother before the sexual assault occurred. However, he had denied having sexual relations with the mother when he was initially interviewed by authorities. In addition, the mother denied during her testimony that she had ever had sexual contact with defendant. Defendant's explanation thus called upon the jury to decide whether to believe him or the mother. The jury obviously did not credit defendant's testimony, and we cannot substitute our assessment of witness credibility for that of the fact finder. *See McIntier,* 134 P.3d at 471.

Once "the jury did disbelieve [defendant], it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (opinion of Thomas, J., joined by Rehnquist, C.J., and Scalia, J.) (citing *Wilson v. United States,* 162 U.S. 613, 620–21, 16 S.Ct. 895, 40 L.Ed. 1090 (1896)); *accord id.* at 297, 112 S.Ct. 2482 (White, J., concurring in this aspect of Justice Thomas's

opinion); *id.* at 315, 112 S.Ct. 2482 (O'Connor, J., joined by Blackmun and Stevens, JJ., concurring that evidence was sufficient) ("[Defendant] took the stand and gave an explanation that the jury rejected, thereby implying a finding that the explanation was false."); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (applying in civil context "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt'" (quoting *Wright v. West,* 505 U.S. at 296, 112 S.Ct. 2482, and citing *Wilson,* 162 U.S. at 620–21, 16 S.Ct. 895)).

Taken in the light most favorable to the prosecution, the narrow window of time during which the victim had owned the sweatshirt, combined with the mother's denial and defendant's initial denial of any consensual sexual encounter, suffice to reasonably exclude the hypothesis that the DNA was deposited at a time other than that of the crime. *Cf. Angel,* 701 P.2d at 151 (defendant's fingerprint inside of burglarized home, combined with testimony from homeowners that defendant was never an invited guest, sufficient to convict). Thus, we conclude that the evidence was sufficient to convict. *See McIntier,* 134 P.3d at 471.

Defendant presented extensive evidence at trial suggesting that a neighbor was the perpetrator. But that evidence did not explain the presence of defendant's DNA. And in any event, it was the jury's function to weigh that evidence and resolve conflicts, testimonial inconsistencies, and disputes. *Id.* We cannot act as a thirteenth juror and overrule its assessment of the evidence. *Id.*

## II. Prior Convictions

Defendant contends that the trial court erred in allowing the prosecution to cross-examine him regarding the details of his past felony convictions. We disagree.

## A. Standard of Review

Trial courts have considerable discretion in deciding questions concerning the admissibility of evidence. *People v. Ibarra,* 849 P.2d

33, 38 (Colo.1993); *see People v. Hardy,* 677 P.2d 429, 431 (Colo.App.1983) ("Further examination into the details of prior convictions is within the trial court's discretion, provided that such details are relevant pursuant to CRE 401."). We will affirm a trial court's evidentiary rulings absent an abuse of that discretion. *Ibarra,* 849 P.2d at 38. An abuse of discretion occurs when the trial court's decision is manifestly arbitrary, unreasonable, or unfair. *See id.*

Defendant urges us to apply a de novo standard of review, asserting that the trial court misread the applicable law. When considering defendant's objection to the prosecutor's cross-examination on this issue, the court commented, out of the hearing of the jury: "I don't think it's entirely clear what the case law means about someone being allowed to put in the circumstances of the offense." However, the court followed this comment with an explanation that it allowed the prosecution's questions because defendant had "opened the door" to such inquiry by bringing up facts related to his prior convictions during his testimony on direct examination.

Defendant has not shown the trial court held an erroneous view of the law, and that, with a correct understanding, its decision would have been different. Thus, we are not persuaded that we should deviate from the normal abuse of discretion standard.

### B. Use of Prior Convictions

■ A defendant's prior felony convictions may be used to impeach his credibility if he chooses to testify. § 13–90–101, C.R.S. 2008; *People v. McGhee,* 677 P.2d 419, 423 (Colo.App.1983). Juries may consider prior convictions for the limited purpose of inferring that a witness who disobeyed a social norm in the past may be "violating another norm and lying now." Edward J. Imwinkelried, *Evidentiary Foundations* § 5.10[1] (7th ed.2008). However, prior convictions may not be used to illustrate that a defendant is of bad character and likely acted accordingly in the present case. CRE 404(b); *People v. Spoto,* 795 P.2d 1314, 1318 (Colo.1990). Consequently, a prosecutor's inquiry into prior convictions is typically limited to the name of

the offense and a brief recital of the circumstances. *See Hardy,* 677 P.2d at 431.

■ Courts may relax this limitation if a party "opens the door" to otherwise inadmissible evidence. *See Golob v. People,* 180 P.3d 1006, 1012 (Colo.2008). "The concept of 'opening the door' represents an effort by courts to prevent one party in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression." *Id.* Thus, when criminal defendants attempt to explain away the effect of a prior conviction or minimize their guilt, they open themselves to cross-examination on facts relevant to the direct examination. *United States v. Wolf,* 561 F.2d 1376, 1381 (10th Cir.1977).

### C. Application

■ Here, defendant testified about a series of events that resulted in five prior felony convictions. Specifically, defense counsel asked defendant during direct examination:

As to the nature of the offenses from this November 5th incident, is it correct that it was around 12:00 p.m., it was an attempted traffic stop, you tried to elude the officers for about five minutes, you fired some shots, no one was injured, you hit a median with the van and crashed, you were arrested and then less than a quarter gram of methamphetamine was found in your backpack[?]

Defendant responded affirmatively and his counsel moved on to another line of questioning.

The prosecutor—over defendant's objection—sought to elaborate upon these events during cross-examination. The prosecutor's questions brought out additional information concerning the speed and location of the automobile chase, the nature of the shots fired, and the fact that the shots were directed toward police. After several minutes of questions regarding these events, the trial court told the prosecutor to move on to other questions.

After the trial court excused the jury for the day, counsel made a record regarding the prior conviction facts. The court then stated:

I don't think it's entirely clear what the case law means about someone being allowed to put in the circumstances of the offense. Generally if there is an objection I would limit it to what the actual name of the offense is, but because the Defense went into some of the factual circumstances as they saw it of this conviction, I thought it was really appropriate to allow some discussion of that. As I said at the bench, I wasn't going to let [the prosecutor] go on forever about this, but once the Defense opened the particular doors to the facts of the offense, I think the People only fairly are allowed to put in some other information about that if they have information that's contrary, which they did.

The trial court did not abuse its discretion. As the court noted, defendant chose to reveal certain facts regarding his prior felony convictions on direct examination that presented a synopsis of the surrounding circumstances painting him in the best possible light. The trial court's determination that this opened the door to further inquiry by the prosecution was not arbitrary, unreasonable, or unfair. Rather, it was consistent with the notion that one party in a criminal trial should not be allowed to present a version of the facts that, if left unelaborated, could mislead the jury. *See Golob,* 180 P.3d at 1012.

Defendant contends the prosecution's cross-examination was improper because it did not directly rebut any of his testimony regarding prior convictions. However, cross-examination regarding prior convictions is also proper to provide a more complete "context" needed to avoid an "incorrect or misleading impression." *See id.* The trial court's effort to ensure that defendant's version of events was balanced by the prosecution's was well within its discretion.

In addition, the prosecutor's comments in closing argument regarding defendant's prior convictions were limited to impeaching his credibility as a witness. As noted above, this was a proper use of such information.

In sum, we reject defendant's contention that the trial court erred by allowing the prosecution to elaborate on his past felony convictions.

## III. Shifting the Burden of Proof

Defendant next contends that his conviction must be reversed because the trial court allowed the prosecution to shift the burden of proof to him. Defendant argues that this occurred when the prosecutor asked an expert witness whether defendant had conducted a particular scientific test on a piece of evidence. Because we conclude that any error was harmless beyond a reasonable doubt, we reject defendant's contention that reversal is required.

### A. Standard of Review

As noted previously, we review a trial court's decision regarding the admissibility of evidence for abuse of discretion. *Ibarra,* 849 P.2d at 38. Even if an abuse of discretion has occurred, however, we will not reverse a trial court's determination if the error was harmless. *See Chapman v. California,* 386 U.S. 18, 21–22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). When errors are of constitutional dimension, reversal is required unless the error was harmless beyond a reasonable doubt. *See id* at 24, 87 S.Ct. 824; *Golob,* 180 P.3d at 1013.

### B. The Burden of Proof

The Due Process Clause protects an accused against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This burden of proof cannot be shifted from the prosecution to a defendant during a criminal trial, and a defendant may not be called upon to affirmatively prove that he or she did not commit a crime. *See Leonard v. People,* 149 Colo. 360, 372, 369 P.2d 54, 61 (1962). Accordingly, the prosecution cannot place upon a criminal defendant the burden of proving innocence through the testing of evidence. *See id.; People v. Beasley,* 384 Ill.App.3d 1039, 323 Ill.Dec. 558, 893 N.E.2d 1032, 1040 (2008) (though defendants may be able to submit evidence for fingerprint analy-

sis, they have no burden to do so); Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence* § 2:2 (15th ed.1997).

In some circumstances, improper questioning of an expert witness could imply to jurors that a defendant carries this burden. *See People v. Lehmkuhl,* 117 P.3d 98, 105 (Colo. App.2004), (discussing *Hayes v. State,* 660 So.2d 257, 265 (Fla.1995)); *Beasley,* 323 Ill. Dec. 558, 893 N.E.2d at 1032. However, such circumstances are not present in this case.

### C. Application

■ Here, the prosecution called an expert in the fields of serology, forensic DNA, and blood stain analysis. Defendant cross-examined this witness regarding a sample of stained carpet taken from the crime scene that had tested presumptively positive for the presence of semen. His examination of the expert revealed that a test that could have conclusively confirmed the presence of semen was available but was not performed. The expert stated that the test was not performed because doing so would have consumed the stain.

On redirect examination the prosecutor asked why the stain could not be consumed. The witness replied: "We are mandated to set aside half of every stain unless we have permission to consume. And that's for future retesting typically by the Defense." The prosecutor then asked—over defendant's objection—whether defendant had done any testing of the stain.

We perceive that the prosecution's second question, regarding whether defendant conducted his own testing of the carpet stain, was improper. Such questions may imply to juries that defendants have some obligation to prove their own innocence, which clearly they do not. Thus, the trial court should have sustained defendant's objection to the question.

### D. Harmlessness

■ The trial court's error was, however, harmless beyond a reasonable doubt. Defendant hoped to use the stain to show that someone else's semen was found near the scene of the crime. Indeed, defendant's cross-examination of the expert revealed that a substance that was either semen or some other bodily fluid had been found and could not be attributed to him. Thus, the prosecution's question did not detract from the stain's evidentiary value to defendant.

Additionally, the expert did not know the answer to the prosecutor's question. The jury thus gleaned little from this expert that could have led it to believe that defendant bore, yet failed to carry, some burden to independently test evidence.

The remainder of the trial proceedings served to deemphasize the question. Defendant stated in closing argument that he had no obligation to test the carpet stain. The prosecution's closing argument did not reference whether defendant tested the stain, nor did the prosecutor argue that defendant had any obligation to do so. Additionally, the trial court provided the jury with instructions that clearly placed the burden of proof on the prosecution. We presume that the jury understood and heeded these instructions. *People v. Dunlap,* 975 P.2d 723, 744 (Colo. 1999).

Under these circumstances, the prosecution's single improper question in no way contributed to defendant's conviction. *See Golob,* 180 P.3d at 1013. We thus conclude that the error was harmless beyond a reasonable doubt.

### IV. Prosecutorial Misconduct in Closing Argument

Defendant contends that the prosecutor's closing argument constituted prosecutorial misconduct. We disagree.

### A. Standard of Review

■ Trial courts generally have discretion to determine whether a prosecutor's statements constitute inappropriate conduct. *See Harris v. People,* 888 P.2d 259, 265 (Colo. 1995). Thus, we will not disturb a trial court's rulings on the scope of closing argument "in the absence of a gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Moody,* 676 P.2d 691, 697 (Colo.1984).

■ We review prosecutors' statements to which no objection was made at trial for plain error. *Domingo–Gomez v. People,* 125 P.3d 1043, 1053 (Colo.2005). Plain error occurs only when an error so undermines the fundamental fairness of a trial that it casts serious doubt on the reliability of the jury's verdict. *Id.*

### B. Standards for Judging Misconduct

■ It is well established that prosecutors should not express their personal beliefs or opinions as to the truth or falsity of any testimony or evidence, or as to the guilt or innocence of the defendant. *United States v. Young,* 470 U.S. 1, 7–9, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Domingo–Gomez,* 125 P.3d at 1049; *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* 3–5.8 (3d ed.1993). Prosecutors' injections of personal opinion are especially prejudicial when they imply that they have official access to facts and information not presented to the jury. *See Domingo–Gomez,* 125 P.3d at 1049.

■ A prosecutor's closing arguments may, however, include reasonable inferences that may be drawn from the facts in evidence. *See id.* at 1048. In presenting their arguments, prosecutors have wide latitude in the language and style they choose to employ. *See id.*

### C. Application

Here, defendant argues that four different comments in the prosecutor's closing argument amounted to prosecutorial misconduct. We disagree.

#### 1. Prosecutor's Comment on the Victim's Statements

■ The first comment related to the victim's description of her attacker's height, as provided to police shortly after the assault. The prosecutor stated, "I think that's completely accurate," and defendant promptly objected. The trial court sustained the objection and immediately told the jury that "the personal opinions of the lawyers aren't what's [at] issue here."

■ We presume that juries follow trial courts' instructions. *Domingo–Gomez,* 125 P.3d at 1053. Thus, the trial court's immediate instruction to the jury—which effectively told it to ignore the prosecutor's statement—cured any error.

#### 2. Prosecutor's Use of "I Submit"

■ The second and third comments involved the use of the phrase "I submit." During rebuttal closing argument the prosecutor said: "And you can look to him and tell whether or not he was telling the truth. I submit he wasn't." Later, the prosecutor said: "So when you go back, do you believe him? I'd submit not."

Defendant did not object to either of these statements at trial. Thus, we review for plain error. *Id.*

■ A prosecutor's use of the phrase "I submit" is not necessarily impermissible personal opinion. *See People v. Washington,* 179 P.3d 153, 169 (Colo.App.2007), *aff'd,* 186 P.3d 594 (Colo.2008); *Mandez,* 997 P.2d at 1269. Here, the phrase was used in obvious comment on defendant's veracity. However, unlike a direct accusation of lying, these statements did not have the "same degree of rhetorical power to necessarily imply that they [were] the personal opinion of the prosecutor." *See Domingo–Gomez,* 125 P.3d at 1051 (distinguishing a prosecutor's argument that defendant "did not tell the truth" from the argument that defendant "lied").

Even assuming, without deciding, that the "I submit" comments of which defendant complains constituted error, the comments were of far lesser severity and frequency than those that have previously been found to constitute plain error. *Cf. Wilson v. People,* 743 P.2d 415, 417, 421 (Colo.1987) (prosecutor's remarks that defendant and his wife "lied" in their testimony amounted to plain error). We cannot conclude that these comments call into question the fundamental fairness of defendant's trial. *See Domingo–Gomez,* 125 P.3d at 1053. Consequently, we reject defendant's contention that they constitute prosecutorial misconduct.

### 3. Prosecutor's "Common Sense" Analogy

 Defendant asserts that an analogy used by the prosecutor in rebuttal closing argument was veiled personal opinion constituting misconduct. We disagree.

The prosecutor told the members of the jury that they should imagine themselves sitting at home and listening to a friend tell them a story about a rape that had occurred. The point of the prosecutor's analogy seems to have been that the jury could use its common sense, and that if told about the present case's evidence in other circumstances, jurors would conclude—as the prosecutor stated—"He did it. He's guilty, that [story is] a load." Defendant objected to the analogy.

We conclude that the prosecutor's use of the analogy was not improper. The details of the analogy closely paralleled the evidence adduced at trial. Final arguments may include the facts in evidence, and prosecutors have wide latitude as to the style and approach of their presentations. *See Domingo–Gomez*, 125 P.3d at 1048. Although this particular approach clearly constituted commentary on defendant's veracity, it was not a clear statement of the prosecutor's personal opinion. Additionally, the analogy did not imply that the prosecutor had information that had not been presented to the jury.

Accordingly, the trial court did not abuse its discretion in rejecting defendant's objection.

## V. Cumulative Error

Defendant contends that even if individual errors in his trial were harmless, their cumulative effect deprived him of a fair trial. We disagree.

### A. Applicable Standards

 A cumulative error analysis aggregates all trial errors that individually have been found harmless, and therefore not reversible, and analyzes whether their cumulative effect is such that they can no longer be deemed harmless. *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir.1990); *see People v. Reynolds*, 194 Colo. 543, 545, 575 P.2d 1286, 1289 (1978). The analysis requires that numerous errors have actually occurred, not merely be alleged. *People v. Rivers*, 727 P.2d 394, 401 (Colo.App.1986). Individual rulings that adversely affect a party, if not determined to be erroneous, cannot serve as the basis for reversal under a cumulative error analysis. *Rivera*, 900 F.2d at 1470–71.

### B. Application

 Here, we have found only one error: a single improper question to an expert witness. We have already determined that the error does not require reversal. Consequently, we reject defendant's contention.

## VI. Constitutionality of the Sex Offender Statute

Defendant challenges the constitutionality of Colorado's Sex Offender Lifetime Supervision Act. He asserts arguments identical to those rejected in *People v. Oglethorpe*, 87 P.3d 129 (Colo.App.2003), and *People v. Strean*, 74 P.3d 387 (Colo.App.2002). We reject the arguments for the same reasons stated in the opinions in those cases.

## VII. Sentencing

Defendant contends that the thirty-two-year lower limit of his indeterminate sentence exceeds the maximum authorized by law. The People concede this contention, and we agree.

### A. Standard of Review

We review issues of statutory construction de novo. *Alvarado v. People*, 132 P.3d 1205, 1207 (Colo.2006).

### B. The Act

The Colorado Sex Offender Lifetime Supervision Act of 1998 requires that sex offenders receive indeterminate sentences. § 18–1.3–1004, C.R.S.2008. Specifically, it mandates that those convicted of certain crimes be sentenced to "at least the minimum of the presumptive range specified in section 18–1.3–401 for the level of offense committed and a maximum of the sex offender's natural life." § 18–1.3–1004(1), C.R.S. 2008. Sexual assault is one of the crimes to

which the Act's sentencing provisions apply. § 18–1.3–1003(5)(a)(I)(A).

The Act requires that only the upper end of a sentence be indeterminate. *See Vensor v. People,* 151 P.3d 1274, 1277–78 (Colo.2007). Courts may impose sentences of up to twice the maximum of the presumptive range if aggravating factors are present. § 18–1.3–401(6), C.R.S.2008. Thus, the Act must be construed to require sentencing to an upper term of the sex offender's natural life and a lower term "of a definite number of years, not less than the minimum nor more than twice the maximum of the presumptive range authorized for the class of felony of which the defendant stands convicted." *Vensor,* 151 P.3d at 1279.

### C. Application

The sexual assault conviction here is a class three felony. § 18–3–402(1)(a), (4), C.R.S.2008. The presumptive sentencing range for a class three felony is four to twelve years of imprisonment. § 18–1.3–401(1)(a)(V)(A).

Defendant was sentenced to a minimum of thirty-two years in the custody of the DOC. That minimum sentence is greater than twice the twelve-year presumptive maximum for a class three felony. Thus, defendant's sentence exceeds what is authorized by law.

The judgment is affirmed. Defendant's sentence is vacated, and the case is remanded to the trial court for resentencing.

Judge ROY and Judge CONNELLY concur.