23CA1010 Peo v Alvarez Velasquez 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1010
El Paso County District Court No. 22CR885
Honorable Robin Chittum, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jesus Alvarez Velasquez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LUM
Lipinsky and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Carrie E. Skahan, Alternate Defense Counsel, Colorado Springs, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jesus Alvarez Velasquez, appeals his convictions for various illegal drug and vehicular offenses.  We affirm.

## I.     Background

¶ 2     While initiating a traffic stop, Officer Logan Scheppele suspected that the vehicle's driver, Alvarez Velasquez, possessed illegal drugs.  For this reason, Scheppele spent two to three minutes calling for a K-9 officer to conduct a dog sniff around the vehicle.

¶ 3     After the call, Scheppele instructed Denise Pennington, who was then a police academy recruit, on preparing a traffic citation. Pennington began writing the citation, and as she finished it, the K-9 officer arrived with the dog, which alerted to the presence of illegal narcotics.[1]  Officers detained Alvarez Velasquez at the scene. While walking toward the vehicle, Scheppele spotted on the pavement outside the driver's door a white plastic bag tied into a knot.  The bag contained an off-white crystalline substance that Scheppele suspected was methamphetamine.  The methamphetamine was later found to weigh about three grams. Officers also discovered about twelve grams of methamphetamine in

---

[1] The dog was not certified or trained to alert to the presence of marijuana.  *See People v. McKnight*, 2019 CO 36, ¶ 55.

1

Alvarez Velasquez's pocket. A vehicle search uncovered around twenty-seven grams of methamphetamine, drug paraphernalia, and a loaded semiautomatic handgun.

¶ 4 Alvarez Velasquez was charged with possession with intent to manufacture or distribute a controlled substance (possession with intent), possession of drug paraphernalia, possession of a weapon by a previous offender (POWPO), displaying fictitious or altered license plates, unregistered vehicle, and failure to signal for a turn.

¶ 5 The jury acquitted Alvarez Velasquez of possession with intent and POWPO. However, it convicted him of possession of a controlled substance (a lesser included offense of possession with intent), possession of drug paraphernalia, and the vehicular offenses. The court sentenced him to two years of probation.

¶ 6 Alvarez Velasquez appeals. He asserts that the district court erred by denying his pretrial motion to suppress the evidence seized after the dog sniff. He also contends that the prosecutor committed misconduct during voir dire by implicating Alvarez Velasquez's right to remain silent and improperly educating prospective jurors about the prosecution's theory of the case. Lastly, he asserts that reversal is required under the cumulative error doctrine.

## II. Motion to Suppress

### A. Applicable Facts

¶ 7    Before trial, Alvarez Velasquez moved to suppress all evidence found after the dog sniff.  He argued then, as he does here, that Scheppele unconstitutionally prolonged the traffic stop to conduct the dog sniff and subsequent search.

¶ 8    The district court held a hearing on the motion.  The following facts (1) are undisputed by the parties; (2) were found by the district court and supported by the record; or (3) are based on our review of Scheppele's body camera footage.

¶ 9    While on patrol with Pennington in an area near two hotels that Scheppele described as having "a lot of narcotic activity," Scheppele followed a Honda driven by Alvarez Velasquez.  Scheppele observed that the Honda had windows tinted more darkly than was permissible, "fictitious license plates that came back to a different style vehicle," and failed to signal at two turns.  Scheppele observed the Honda pull into the parking lot of one of the two hotels and initiated a traffic stop for the turn signal failure, license plates, and window tint.

¶ 10    Scheppele approached the vehicle and began explaining the reasons for the stop. Scheppele's bodycam footage shows that Alvarez Velasquez immediately disputed (and continued to dispute) the window tint violation and partially tore the tint off the driver's side window. He also disputed that he failed to signal. Finally, Alvarez Velasquez said that he didn't know about the fictious plates because the vehicle was owned by his mother, not him. When asked for registration and insurance, Alvarez Velasquez glanced quickly at the passenger side of the car but didn't attempt to open the glove box or center console, again explaining that his mother owned the vehicle. Alvarez Velasquez was nervous and somewhat argumentative, but he didn't raise his voice during this initial encounter.

¶ 11    Scheppele testified that, based on his training and experience, the dark window tint was "effectively put on for the purpose of obscuring view inside of the vehicle," as the tint "makes it easier for somebody to conceal an object, which is done when people are distributing narcotics." Because of the tint and the other facts described above, Scheppele said that "everything [was] showing that [Alvarez Velasquez] [was] evasive for something that's inside" the

4

car, which led him to believe that Alvarez Velasquez had illegal drugs.

¶ 12    After the initial encounter, Scheppele returned to his patrol car and called for a K-9 officer to conduct an open-air dog sniff around the Honda.  The call took approximately two to three minutes, during which time Scheppele did not perform other activities.  While waiting for the K-9 officer, Scheppele instructed Pennington to write the ticket.  Because Pennington was still a recruit, it took her more than thirteen minutes to type the citation.

¶ 13    The K-9 officer and his dog arrived while Pennington was writing the ticket.  The officer walked the dog around the car, and the dog indicated the presence of narcotics.

¶ 14    The district court found Scheppele's testimony credible. Though it noted that the case presented a close call, the court denied Alvarez Velasquez's motion to suppress because it concluded that (1) Scheppele did not divert from the traffic stop by calling for the K-9 officer; and (2) even if there had been a diversion, Scheppele had reasonable suspicion of other criminal activity to prolong the traffic stop for the dog sniff.

## B. Standard of Review and Applicable Law

¶ 15 "A trial court's suppression order presents a mixed question of fact and law." *People v. Gamboa-Jimenez*, 2022 COA 10, ¶ 35. "We defer to the court's factual findings if they are supported by competent evidence in the record, but we assess the legal significance of those facts de novo." *Id.* However, we may also rely on undisputed facts in the record, and we may independently review any portion of the challenged incident that was audio or video recorded. *People v. Willoughby*, 2023 CO 10, ¶ 18; *see also People v. Taylor*, 2018 CO 35, ¶ 7.

¶ 16 "The Fourth Amendment to the United States Constitution guards citizens against 'unreasonable searches and seizures' by the police." *People v. Johnson*, 2024 CO 47, ¶ 23 (quoting U.S. Const. amend. IV); *see also* U.S. Const. amend. XIV. "Absent an exception, a warrantless search or seizure of a person is presumed unreasonable and in violation of the Fourth Amendment." *Johnson*, ¶ 23.

¶ 17 "When police obtain evidence in violation of the Fourth Amendment, the exclusionary rule ordinarily bars the prosecution from introducing that evidence against the defendant in a criminal

6

case." *People v. Vaughn*, 2014 CO 71, ¶ 10.  One exception to the warrant requirement is an investigatory stop that is "supported by reasonable suspicion." *People v. Chavez-Barragan*, 2016 CO 66, ¶ 19; *see People v. Funez-Paiagua*, 2012 CO 37, ¶ 7.

¶ 18     A traffic stop is a "limited, investigatory intrusion[]" regarding a suspected traffic violation.  *Chavez-Barragan*, ¶ 19.  A traffic stop prompted by reasonable suspicion of a traffic violation "can become unreasonable if it is 'prolonged beyond the time reasonably required to complete' the purpose of the stop."  *Johnson*, ¶ 26 (quoting *Chavez-Barragan*, ¶ 19); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015).  Law enforcement may not conduct an on-scene investigation of ordinary criminal activity "in a way that prolongs the [traffic] stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Rodriguez*, 575 U.S. at 355.

¶ 19     Thus, a "prolonging" inquiry has two parts.  First, did the officer divert from the mission of the traffic stop by conducting investigation into other criminal activity in a way that added time to the stop?  *See id.*  And second — if so — did the officer have reasonable suspicion to justify detaining the individual at the time

7

the stop was diverted?  *See id.*; *see also United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (holding that, when assessing reasonable suspicion, the court should consider only the facts known to the officer at the moment the officer diverted and extended the traffic stop).

¶ 20    We determine whether an officer had reasonable suspicion by looking for specific facts "'known to the officer,' which 'taken together with rational inferences from those facts,' [give] rise to 'a reasonable and articulable suspicion of criminal activity' justifying the intrusion into the defendant's personal privacy." *People v. Wheeler*, 2020 CO 65, ¶ 13 (quoting *Funez-Paiagua*, ¶ 9).  "This is an objective inquiry that requires us to consider the totality of the circumstances at the time of the intrusion." *Gamboa-Jimenez*, ¶ 40.

### C.    Analysis

¶ 21    Alvarez Velasquez doesn't dispute the validity of the initial stop.  *See id.* at ¶ 37 ("[A]n officer only needs to have reasonable suspicion that a driver has committed a traffic violation to pull the driver over.").  Instead, he contends that (1) Scheppele diverted from the mission of the traffic stop by calling for the K-9 officer, waiting for the officer to arrive, and using Pennington to slow the process of

8

writing a ticket; (2) these activities added time to the traffic stop; and (3) Scheppele didn't have a reasonable suspicion that Alvarez Velasquez had committed another crime.

¶ 22    We need not address Alvarez Velasquez's first two arguments because we conclude that Scheppele had reasonable suspicion of other criminal activity at the time he first called for the K-9 officer — the earliest point at which he began conducting non-traffic-stop-related tasks.

¶ 23    By the time Scheppele called for the K-9 officer, he had the following specific and articulable facts to support reasonable suspicion that Alvarez Velasquez had concealed drugs or other contraband inside the vehicle:

- The windows of the Honda were darkly tinted, which Scheppele testified from his training and experience may indicate an attempt to conceal items in the vehicle.

- Alvarez Velasquez (1) attempted to negate the reasons for the traffic stop by disputing the turn signal, deflecting blame for the fictious plates, and pulling off the driver-side window tint; and (2) made no attempt to search the center console or glove box to find registration or insurance

9

documents. From this behavior, Scheppele could infer that Alvarez Velasquez was attempting to conceal something inside the vehicle. *See Wheeler*, ¶ 18 n.3 ("While not necessarily indicative of wrongdoing, 'evasive behavior is a pertinent factor in determining reasonable suspicion.'" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))).

- Alvarez Velasquez distanced himself from ownership of the vehicle, from which Scheppele could infer that Alvarez Velasquez was attempting to avoid being found in possession of items in the vehicle (even if it was true that he wasn't the owner). *Cf. People v. Reyes-Valenzuela*, 2017 CO 31, ¶ 14 ("A reasonable, articulable suspicion 'may exist even where innocent explanations are offered for conduct.'" (quoting *People v. Castaneda*, 249 P.3d 1119, 1122 (Colo. 2011))).

- Alvarez Velasquez drove the Honda with fictitious plates, which Scheppele testified could indicate that "this would be a stolen vehicle, and [the driver] [is] hiding something." *Cf. People v. Barnett*, 2024 CO 73, ¶ 15 ("Mismatched plates are

as suspicious as missing registration papers, which provide reasonable suspicion [of criminal activity].").

- Alvarez Velasquez pulled into a hotel that Scheppele testified was known for narcotics activity. *See People v. Archuleta*, 980 P.2d 509, 515 (Colo. 1999) (holding that "a history of drug transactions in a locality can provide one element of support" for reasonable suspicion); *see also Illinois*, 528 U.S. at 124 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

¶ 24    Alvarez Velasquez challenges these facts by arguing that none of them *alone* leads to reasonable suspicion. But we "may not dismiss or discount acts simply because in isolation they may each have plausible innocent explanations." *Gamboa-Jimenez*, ¶ 40. Together, the tinted windows, the location of the Honda, Alvarez Velasquez's behavior, and the fictitious license plates are specific articulable facts that support a reasonable suspicion that Alvarez Velasquez was attempting to conceal drugs or other contraband. *Cf. People v. Ramirez*, 1 P.3d 223, 225-26 (Colo. App. 1999) (holding

that factors for reasonable suspicion include "an area's reputation as a locus of drug activity, an individual's attempt to shield his or her conduct from view, . . . and the person's nervous or unduly cautious behavior").

¶ 25　　For these reasons, we conclude that the district court didn't err by denying the motion to suppress.  *See Chavez-Barragan*, ¶ 21.

### III.　Voir Dire Misconduct

¶ 26　　Alvarez Velasquez contends that the prosecutor committed misconduct during voir dire by (1) commenting on Alvarez Velasquez's right to silence by referencing the movie *Fight Club*; (2) implying Alvarez Velasquez was lying during his conversations with law enforcement; and (3) improperly educating jurors regarding the prosecution's theory of the case.  We aren't persuaded.

### A.　Standard of Review and Applicable Law

¶ 27　　We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances.  *Id.* Second, if the conduct was improper, we decide whether it warrants

12

reversal under the appropriate standard. *Id.* Because each step is analytically different, we can uphold the convictions if the improper remarks were harmless. *Id.*

¶ 28    "While a prosecutor can use every legitimate means to bring about a just conviction, she has a duty to avoid using improper methods designed to obtain an unjust result." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). "We must evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury." *People v. McMinn*, 2013 COA 94, ¶ 60.

¶ 29    If the defendant failed to object at trial, we review for plain error. *People v. Van Meter*, 2018 COA 13, ¶ 26. "Reversal is required under this standard only if the error was obvious and 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (quoting *Hagos v. People*, 2012 CO 63, ¶ 14); *see also People v. Crabtree*, 2024 CO 40M, ¶¶ 42-43.

## B. Right to Remain Silent

¶ 30    Alvarez Velasquez contends that the prosecutor improperly used a line from the movie *Fight Club* to invite prospective jurors to infer Alvarez Velasquez's guilt based on his silence.

¶ 31    At the start of voir dire, the prosecutor asked prospective jurors about famous lines from *Fight Club* — for example, "Why is the first rule of *Fight Club* we don't talk about *Fight Club*?"  The prosecutor then asked jurors, "[I]f we're doing something we're not supposed to do, why are we not going to talk about it?"  The prosecutor elaborated by saying, "[I]s it fair to say that it's sort of a natural human reaction from about three years old on that we learn that we're not going to talk about this thing that's going to get us in trouble?"

¶ 32    Defense counsel requested a bench conference and said he was concerned that the prosecutor was "going to talk about the right to remain silent . . . .  [S]o I just want to make sure that that's not where we're going."  The prosecutor responded that the line of questioning pertained to the truthfulness of Alvarez Velasquez's statements during the traffic stop, not his right to remain silent.

¶ 33    The district court then said to defense counsel, "You want me to jump in and give them an instruction?" Defense counsel agreed that the court should give the jury an instruction on Alvarez Velasquez's right to remain silent and said, "[I]f there's further objections, obviously I'll make them. But if the Court would do that at this point, then I would appreciate it."

¶ 34    The court admonished the prosecutor to "watch where you go" and then instructed the jury that Alvarez Velasquez had a right to remain silent and that his decision not to testify "cannot be used as an inference of guilt and cannot prejudice [him] in any way." The prosecutor continued her line of questioning, and defense counsel didn't object further.

¶ 35    We reject Alvarez Velasquez's suggestion that the court didn't rule on his counsel's objection. The court impliedly sustained the objection when it offered the relief of reading the jury instruction regarding the right to remain silent. Alvarez Velasquez accepted that relief, didn't ask for further relief, and didn't make any more objections. We therefore decline to review this contention. *See People v. Alemayehu*, 2021 COA 69, ¶ 101 (declining to review alleged misconduct when the district court sustained the objection

and no further relief was requested); *People v. Douglas*, 2012 COA 57, ¶ 65 (same); *Mingo v. People*, 468 P.2d 849, 851 (Colo. 1970) (same).

## C. Alvarez Velasquez's Truthfulness

¶ 36    Alvarez Velasquez next contends that the *Fight Club* colloquy was also improper because it implied that he was a bad person who lied to the police. Because he didn't object on this basis at trial, we review this contention for plain error. *See People v. Tallent*, 2021 CO 68, ¶ 12 ("When a party presents a new argument or alters the grounds for an objection on appeal, the issue is forfeited and reviewable only for plain error.").

¶ 37    Alvarez Velasquez argues that the *Fight Club* analogy harmed his credibility and thereby undermined his theory of defense that "many items in the car, including the gun, did not belong" to him. However, the jury acquitted Alvarez Velasquez of POWPO and possession with intent, indicating that it credited his defense, at least to some extent. Thus, even assuming (without deciding) that the analogy was improper, we discern no prejudice.

## D. Educating the Jury

¶ 38     Alvarez Velasquez next argues that the prosecutor improperly educated the jury about "how to judge credibility of witnesses and [Alvarez Velasquez]" and "how to make factual determinations." We review this contention for plain error in the absence of contemporary objections. *See id.*

¶ 39     During voir dire, the prosecutor questioned jurors about how they judged witness credibility by asking about the following topics:

- what mannerisms the prospective jurors would expect from a twelve-year-old child who wanted to hide that the child had thrown a baseball through a window;

- what the prospective jurors would "expect to see or hear from [the witnesses] in their demeanor and actions and behavior" if the jurors believed the witnesses were telling the truth versus lying; and

- if the prospective jurors would intuitively weigh the credibility of testifying police officers differently than that of other witnesses.

¶ 40    Near the end of the prosecutor's voir dire, one prospective juror opined about determining credibility based on physical appearances, stating,

> Yeah, I think another thing is what the police officer would look like and how they carried themselves when they walk in because if you don't know much about law enforcement — you see, let's say, a guy, 6-foot-5, 250-pound person like The Rock, they probably have a little more authoritative bias over you than if it's someone that's a little jittery, would that person have less or equal credibility to the guy that looks like The Rock?

The prosecutor and the juror then had the following exchange:

> [PROSECUTOR:] So fair to say that if I walk in dressed as a police officer but the guy in front of me, the police officer in front of me, was The Rock — we have very slightly different physiques — would you say that you're already judging people based on their appearance even beyond the uniform aspect?
>
> [PROSPECTIVE JUROR:] Yes. Even going day-to-day, I'm sure if we're all just walking in here and we see some person doing something that might look weird on the street, we're judging them, that person is weird. Or we just see someone working out at the gym, they look really good today. Or just some random person, I don't like how he dressed or something.
>
> [PROSECUTOR:] Fair to say once, sort of, puberty happens in middle school, we start

18

> learning to look at everybody and make
> judgments about them, whether or not they
> are going to be our friends, whether or not we
> like them or hate them, whether or not they
> are weird. All of that is happening all of the
> time; is that fair?

¶ 41    We perceive no misconduct in the prosecutor's initial questions or the exchange with the juror. Voir dire allows counsel to determine whether any prospective jurors have biases that would impair a fair and impartial trial. *People v. Wilson,* 2013 COA 75, ¶ 12. The prosecutor didn't misstate the law, present inadmissible factual material, or argue the prosecution's case. *See People v. Carter,* 2015 COA 24M-2, ¶ 71. Instead, the questions tested whether the prospective jurors could follow instructions and weigh credibility in an impartial and unbiased manner. When the one prospective juror indicated that a witness's physical appearance might impact his assessment of the witness's credibility, the prosecutor asked appropriate follow-up questions to ensure she understood the juror's comments. Alvarez Velasquez didn't object to the juror serving on the jury and doesn't contend on appeal that the juror was biased.

¶ 42    Furthermore, even if the prosecutor had committed misconduct, we discern no prejudice. The evidence that Alvarez Velasquez committed the traffic offenses and possession of a controlled substance was overwhelming. In fact, defense counsel admitted during opening statements that Alvarez Velasquez possessed the methamphetamine and said, "[W]e're going to ask you to convict [Alvarez Velasquez] of what he's guilty of which is possession of a controlled substance. Not intent to distribute." Then, during closing argument, defense counsel reiterated that possession with intent and POWPO were the only "two allegations that . . . are in dispute. The rest are not." And as explained above, the jury acquitted Alvarez Velasquez of those two offenses, consistent with his theory of defense.

¶ 43    To the extent Alvarez Velasquez argues that the prosecutor committed misconduct by using an improper Airbnb analogy, we decline to address that argument because it is undeveloped. *See People v. Cuellar*, 2023 COA 20, ¶ 44.

## IV.    Cumulative Error

¶ 44    Finally, Alvarez Velasquez contends that the doctrine of cumulative error requires reversal.

20

¶ 45 "[N]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *Oaks v. People*, 371 P.2d 443, 446 (Colo. 1962)).  Reversal for cumulative error "requires that numerous errors have actually occurred, not merely be alleged." *People v. Clark*, 214 P.3d 531, 543 (Colo. App. 2009), *aff'd on other grounds*, 232 P.3d 1287 (Colo. 2010).  Because we identified only a single assumed error (that the prosecutor improperly commented on Alvarez Velasquez's truthfulness or credibility in her comments about the movie *Fight Club*), the doctrine of cumulative error doesn't apply.  *See id.*

## V.    Disposition

¶ 46 The judgment of conviction is affirmed.

JUDGE LIPINSKY and JUDGE PAWAR concur.