The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 8, 2020

## 2020COA142

## No. 18CA1072, *People v. Burgandine* — Crimes — Stalking

The defendant challenges his stalking conviction under section 18-3-602(1)(a), C.R.S. 2019, contending that the term "contacts" used in that section cannot reasonably be interpreted to include general communications, like phone calls and texts, because a different section of the stalking statute, section 18-3-602(1)(b) addresses "any form of communication."

Applying the plain language of "contacts," a division of the court of appeals concludes that the term does include communications, such as phone calls and text messages. And it declines the defendant's request to interpret the term "contacts" narrowly to avoid redundancy.

Because the evidence showed the defendant repeatedly made threatening text messages and phone calls to the victim, the division affirms the stalking conviction.

COLORADO COURT OF APPEALS     **2020COA142**

---

Court of Appeals No. 18CA1072
Jefferson County District Court No. 17CR3003
Honorable Randall C. Arp, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Edward Burgandine,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE DUNN
Freyre and Brown, JJ., concur

Announced October 8, 2020

---

Philip J. Weiser, Attorney General, Marixa Frias, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica Sommer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     For seven hours, James Edward Burgandine relentlessly texted and called his ex-girlfriend.  Many of the texts and calls contained threats against her and others.  A jury found Burgandine guilty of harassment and credible threat stalking.

¶ 2     Burgandine challenges only his stalking conviction, contending the term "contacts" in section 18-3-602(1)(a), C.R.S. 2019 (subsection (1)(a)), under which the prosecution charged him, can't reasonably be interpreted to "include general communications such as phone calls and text messages."  He says this is because phone calls and text messages fall under a different subsection of the stalking statute covering "any form of communication," section 18-3-602(1)(b) (subsection (1)(b)).  And since he was not charged under subsection (1)(b), Burgandine maintains that insufficient evidence supports his credible threat stalking conviction and that we must vacate it.  Because we disagree that phone calls and text messages are not "contacts" under subsection (1)(a), we affirm the judgment of conviction.

## I.     Background

¶ 3     Burgandine and the victim share a son.  After their relationship ended, their son lived with the victim.  Although they

didn't have a court-ordered custody agreement, the parents "work[ed] together" to find time for Burgandine to spend with their son.

¶ 4     But one afternoon in October 2015, after the victim refused his request to see their son, Burgandine embarked on a seven-hour tirade directed at the victim, conducted through phone calls and text messages. Threaded through his texts were misogynistic insults labeling the victim a "whore," "skank," and "cunt." Many of the phone calls and texts threatened violence against the victim and, after she told Burgandine that the police would be called, he threatened violence against the police as well.

¶ 5     The prosecution charged Burgandine with harassment, credible threat stalking, and emotional distress stalking. The jury convicted him of the first two charges but acquitted him of the third. The court then sentenced him to three years of supervised probation with ninety days to be served in jail.

## II.   Discussion

### A.   Standard of Review and Statutory Construction

¶ 6     Where, as here, a sufficiency challenge requires us to interpret a statute de novo, we must give effect to the legislature's intent.

*Williams v. People*, 2019 CO 101, ¶ 19; *see also People v. Carian*, 2017 COA 106, ¶ 8. To determine that intent, we start with the language of the statute, giving words their plain and ordinary meanings. *People v. Burnett*, 2019 CO 2, ¶ 20; *People v. Serra*, 2015 COA 130, ¶ 26. If the plain language is clear and unambiguous, we apply the statute as written. *Burnett*, ¶ 20; *Carian*, ¶ 14.

¶ 7    When possible, we give consistent, harmonious, and sensible effect to each part of the statute. *People v. Gallegos*, 2013 CO 45, ¶ 7; *People v. Banks*, 9 P.3d 1125, 1127 (Colo. 2000). And while we avoid constructions that render any words or phrases superfluous, *People v. Null*, 233 P.3d 670, 679 (Colo. 2010), we also avoid interpretations that "defeat legislative intent or lead to absurd results," *Mosley v. People*, 2017 CO 20, ¶ 16.

### B.    The Credible Threat Stalking Statute

¶ 8    A person commits credible threat stalking when he, either directly or indirectly through a third party, knowingly

> (a) [m]akes a credible threat to another person and, in connection with the threat, repeatedly follows, approaches, *contacts*, or places under surveillance that person . . . ; or

> (b) [m]akes a credible threat to another person and, in connection with the threat, repeatedly

3

> *makes any form of communication* with that person, . . . regardless of whether a conversation ensues.

§ 18-3-602(1) (emphasis added).

¶ 9   At trial, the prosecutor argued that Burgandine's phone calls and text messages to the victim were "contacts" under subsection (1)(a).  The prosecutor did not argue that Burgandine followed, approached, or placed the victim under surveillance.  Nor did the People charge Burgandine under subsection (1)(b).

### C.   Interpretation of "Contacts"

¶ 10   Because the statute doesn't define "contacts" and Burgandine doesn't dispute that it's a common term, we begin with the dictionary definition.  *See Cowen v. People*, 2018 CO 96, ¶ 14 (in the absence of a statutory definition "we may consider a definition in a recognized dictionary"); *see also People v. Devorss*, 277 P.3d 829, 837 (Colo. App. 2011) ("'[C]ontact' is a common term.").

¶ 11   "Contact" is defined as "to make connection with" and "get in communication with," including instances of "establishing communication with someone," "touching or meeting," and "meeting, connecting, or communicating."  Webster's Third New International Dictionary 490 (2002).

4

¶ 12    The definition is broad but clear, and it plainly includes general communications.  Indeed, we are not the first court to recognize this plain meaning.  *Serra*, ¶¶ 24-34 (interpreting "contact" in the context of a no-contact order to include "some element of direct or indirect communication, or attempted communication"); *see also Cooper v. Cooper*, 144 P.3d 451, 457-58 (Alaska 2006) ("'Contacting,' as a verb, means in common usage physically touching or communicating."); *Johnson v. State*, 449 S.E.2d 94, 96 (Ga. 1994) ("To 'contact' is readily understood by people of ordinary intelligence as meaning 'to get in touch with; communicate with.'" (quoting American Heritage Dictionary (3d ed. 1992))) (alteration omitted).[1]

---

[1]  Though the legislature didn't define "contacts," we recognize that other states' stalking statutes define "contact" to include communications.  *See, e.g.*, Alaska Stat. § 11.41.270(b)(4)(E), (F) (West 2019) (defining "nonconsensual contact" to include contact by telephone and by sending mail or electronic communications); Ga. Code Ann. § 16-5-90(a)(1) (West 2019) (defining "contact" as "any communication including without being limited to communication in person, by telephone, by mail, by broadcast, by computer, by computer network, or by any other electronic device"); Okla. Stat. tit. 21, § 1173(F)(4)(e), (f) (West 2019) (defining "unconsented contact" to include contact by telephone and sending mail or electronic communications); Or. Rev. Stat. § 163.730(3)(d), (e) (West 2019) (defining "contact" to include "[s]ending or making written or electronic communications in any form" and "[s]peaking

¶ 13    Because Burgandine doesn't dispute that phone calls and text messages are communications, applying the plain and ordinary meaning of the word would normally end our inquiry. *See Cowen*, ¶ 12 ("[I]f the language in a statute is clear and unambiguous, we give effect to its plain meaning and look no further.").

¶ 14    But Burgandine asks us to look beyond the common meaning because applying it renders "any form of communication" in subsection (1)(b) redundant. To avoid surplusage, Burgandine says we must read the term in context by applying the noscitur a sociis canon and considering the legislative history which, according to him, support a "more narrow" interpretation of "contacts" that requires "some sort of physical proximity" (and necessarily excludes phone and text message communications).[2]

---

with the other person by any means"); Wash. Rev. Code § 9A.46.110(4) (West 2019) (defining "contact" to include "in addition to any other form of contact or communication, the sending of an electronic communication to the person"); *see also* La. Stat. Ann. § 14:40.2(D)(3)(b)(v), (vi) (2019); Tenn. Code Ann. § 39-17-315(a)(5)(E), (F) (West 2019).

[2] While the People acknowledge that the plain meaning of "contacts" in subsection (1)(a) may "overlap" with "any form of communication" in subsection (1)(b), they don't otherwise address Burgandine's surplusage argument or contend that "any form of communication" has a meaning independent from "contacts."

¶ 15　　In so arguing, Burgandine effectively contends that the resulting redundancy from applying the plain and common meaning of "contacts" is unsound and creates ambiguity that must be resolved through interpretative methods. *See People v. Goodale*, 78 P.3d 1103, 1107 (Colo. 2003) (recognizing we look to interpretive rules and legislative history only where ambiguity exists). And because the plain and common meaning does result in redundancy, we consider his arguments.

### 1.　Noscitur a Sociis

¶ 16　　Under the noscitur a sociis canon, "a word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); *accord St. Vrain Valley Sch. Dist. RE-1J v. A.R.L. by & through Loveland*, 2014 CO 33, ¶ 22. Relying on this canon, Burgandine argues that because all the other types of stalking conduct listed in subsection (1)(a) — "follows," "approaches," and "places under surveillance" — involve a victim's physical location, and two of them ("follows" and "approaches") require "physical proximity," to avoid redundancy, "contacts" "must be similarly construed as requiring some sort of physical proximity" to the

7

alleged victim.  We see several problems with Burgandine's proposed interpretation.

¶ 17     First, we don't agree with Burgandine that the other stalking conduct listed in subsection (1)(a) "denote being within the immediate [or physical] proximity" of a victim.  Of the three companion stalking actions, only one — "approaches" — implies any proximity, but even that term doesn't require "physical" or "immediate" proximity.  And as to the other two stalking actions, technology being what it is, one may surveil or follow a person without ever being physically near them, let alone in their "immediate proximity."  *See People v. Brown*, 2014 COA 130M, ¶ 49 ("A defendant need not be physically present to conduct surveillance . . . ."); *People v. Sullivan*, 53 P.3d 1181, 1184 (Colo. App. 2002) (construing "surveillance" in subsection (1)(a) to include electronic surveillance); *cf. State v. Lee*, 917 P.2d 159, 164 (Wash. Ct. App. 1996) (interpreting "follows" as not being limited to "trail[ing]" or "tail[ing]" the victim but to include movement deliberately correlated to the movements of another), *aff'd*, 957 P.2d 741 (Wash. 1998).

¶ 18    Second, we are not persuaded that section 18-3-602(1)(c) (subsection (1)(c)), "reinforces" Burgandine's interpretation.  That subsection addresses emotional distress stalking and lists all stalking conduct from subsection (1)(a) and subsection (1)(b).  Because the list includes "contacts" and "any form of communication," Burgandine asserts that "contacts" "must have a more narrow meaning."  To be sure, we generally presume that when the legislature uses different words it intends each to mean something different.  *Colo. Med. Bd. v. Office of Admin. Courts*, 2014 CO 51, ¶ 19.  But that doesn't always hold true.  "Redundancies are common in statutory drafting — sometimes in a [legislative] effort to be doubly sure, sometimes because of [legislative] inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication."  *Barton v. Barr*, 590 U.S. ___, ___, 140 S. Ct. 1442, 1453 (2020); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012).  That's the case here where, to capture all stalking conduct, the legislature added a broad word ("contacts") that subsumed a phrase ("any form of communications") already in the statute.

9

¶ 19      Third, and relatedly, the "preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004); *accord King v. Burwell*, 576 U.S. 473, 491 (2015). And "faced with a choice between a plain-text reading that renders a word or clause superfluous and an interpretation that gives every word independent meaning but, in the doing, muddies up the statute — courts 'should prefer the plain meaning . . . .'" *Barton v. U.S. Attorney Gen.*, 904 F.3d 1294, 1301 (11th Cir. 2018) (quoting *Lamie*, 540 U.S. at 536), *aff'd sub nom. Barton*, 590 U.S. ___, 140 S. Ct. 1442; *accord Town of Rib Mountain v. Marathon Cty.*, 926 N.W.2d 731, 738 (Wis. 2019); *see also* Scalia & Garner at 176 ("Put to a choice . . . a court may well prefer [an] ordinary meaning to an unusual meaning that will avoid surplusage."). So, when a word has a plain and ordinary meaning, we can't force it to mean something it doesn't just to avoid surplusage. *See People v. Voth*, 2013 CO 61, ¶ 21 ("A commonly accepted meaning is preferred over a strained or forced interpretation.").

¶ 20      Fourth, Burgandine's proposed interpretation "muddies up the statute." *Barton*, 904 F.3d at 1301. Specifically, it injects ambiguity and presents due process concerns. Due process

requires a criminal statute to provide "fair warning of prohibited conduct" and "standards that are sufficiently precise to avoid arbitrary and discriminatory enforcement." *People v. Graves*, 2016 CO 15, ¶ 17. And though Burgandine asserts that we should construe "contacts" to imply "some sort of physical proximity" requirement, he doesn't say what that means or how a defendant could reasonably know what conduct is prohibited. Nor does he explain how prosecutors or courts would apply such an amorphous requirement.

¶ 21 Finally, if the legislature had intended to narrow the plain meaning of "contacts" to "require some sort of physical proximity," it could have included that requirement in subsection (1)(a). *See Sullivan*, 53 P.3d at 1184 (rejecting argument that "surveillance" in subsection (1)(a) required "physical presence" because, had the legislature intended, it "would have included such a requirement"). Indeed, the legislature has included "physical contact" when it intends to do so. *See, e.g.,* § 18-9-111(1)(a), C.R.S. 2019 (defining harassment to include touching and "physical contact"). But because the legislature didn't define "contacts" in subsection (1)(a) to include physical proximity, neither will we. *People v. Benavidez,*

222 P.3d 391, 394 (Colo. App. 2009) ("[W]e must accept the General Assembly's choice of language and not add or imply words that simply are not there."); *see also People v. Diaz*, 2015 CO 28, ¶ 15.

¶ 22     For these reasons, we are not convinced that noscitur a sociis requires us to disregard the plain and ordinary meaning of "contacts" or narrow the common meaning to include an ill-defined and ambiguous physical proximity requirement.

## 2.     Legislative History

¶ 23     Finally, Burgandine argues that legislative history supports his contention that the General Assembly added "contacts" to the stalking statute to capture conduct other than "communications such as calls and texts," given that such conduct was already prohibited under a different subsection of the stalking statute then in effect.

¶ 24     The legislative history provides some context for the addition of "contacts" to the stalking statute.  *See, e.g.*, *People v. Jones*, 2015 CO 20, ¶ 10 ("[T]he historical development of . . . a statutory scheme can often shed light on the purposes behind its various component parts . . . .").  Before this addition, the stalking statute addressed only situations where a person made a credible threat

and either "repeatedly follow[ed] that person" or "repeatedly [made] any form of communication with that person." § 18-9-111(4)(a)(I)-(II), C.R.S. 1992; *see also* Ch. 88, sec. 1, § 18-3-602, 2010 Colo. Sess. Laws 294 (relocating the relevant portion of section 18-9-111(4) to section 18-3-602).

¶ 25 In proposing the amendment that added "approaches, contacts, or places under surveillance," Ms. Jeanne Smith from the Colorado District Attorneys Council (a contributor to the proposed amendment) explained that the "repeatedly follows" language then in effect did not adequately address instances where "a stalker was watching a victim" or "just leaving notes on the [victim's] car." Hearings on H.B. 99-1168 before the H. Judiciary Comm., 62nd Gen. Assemb., 1st Sess. (Feb. 2, 1999) (statement of Jeanne Smith, Colo. Dist. Attorneys Council); *see* Ch. 215, sec. 1, § 18-9-111, 1999 Colo. Sess. Laws 793.

¶ 26 Given that Ms. Smith referenced a type of communication (leaving notes) to explain one reason for amending the stalking statute to add "approaches, contacts, or places under surveillance," we don't agree with Burgandine that the amendment "was not intended to cover run-of-the-mill communications such as calls and

13

texts." And given that leaving a note on a car requires no proximity to the victim, we don't discern any legislative intent to narrow the meaning of "contacts" or tether it to "some sort of physical proximity." Rather, the legislative discussion focused on expanding the statute to cover more types of stalking conduct.

¶ 27    To sum it up, we decline Burgandine's request to depart from the plain and ordinary meaning of "contacts" by construing it to require "some sort of physical proximity" that the plain text doesn't support. We recognize that the plain meaning of "contacts" in subsection (1)(a) renders "any form of communication" in subsection (1)(b) duplicative, but it is for the legislature, not this court, to re-define "contacts" should it intend it to mean something different than what it plainly does. *See People v. Butler*, 2017 COA 117, ¶ 35.

¶ 28    We therefore conclude that "contacts" under subsection (1)(a) includes phone and text message communications.

D.    Sufficient Evidence Supports the Stalking Conviction

¶ 29    Beyond arguing that phone and text message communications are not prosecutable "contacts" under subsection (1)(a), Burgandine doesn't suggest the evidence was otherwise insufficient to support

14

his stalking conviction. And our review of the evidence confirms that the prosecution introduced substantial and sufficient evidence showing that Burgandine repeatedly threatened the victim through phone calls and text messages. *See People v. Donald*, 2020 CO 24, ¶ 18 (discussing our review of a sufficiency of the evidence challenge).

¶ 30   We thus conclude sufficient evidence supports Burgandine's credible threat stalking conviction.

### III.   Conclusion

¶ 31   The judgment of conviction is affirmed.

JUDGE FREYRE and JUDGE BROWN concur.