22CA0296 Peo v Bergeron 07-25-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA0296 El Paso County District Court No. 20CR1555 Honorable Marcus S. Henson, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Susan Trahan Bergeron, Defendant-Appellant. JUDGMENT AFFIRMED Division V Opinion by JUDGE BROWN Freyre, J., concurs Johnson, J., specially concurs NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 25, 2024 Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee Victor T. Owens, Alternate Defense Counsel, Parker, Colorado, for Defendant-
Appellant 
1 ¶ 1 Defendant, Susan Trahan Bergeron, appeals the judgment of conviction entered after a jury found her guilty of child abuse resulting in serious bodily injury and child abuse resulting in injury. We affirm. I. Background ¶ 2 At trial, the prosecution presented evidence from which the jury could find the following facts. ¶ 3 Bergeron provided daycare for N.P. from June or July 2019 until October 2019, often for more than forty hours per week. During this timeframe, N.P. was between eight and thirteen months old. ¶ 4 On October 9, Bergeron injured N.P.’s mouth. At trial, Bergeron testified that she was feeding N.P. when N.P. turned her head, and Bergeron saw blood. ¶ 5 The next day, N.P. became unresponsive while in Bergeron’s care. According to Bergeron, after N.P.’s mother (mother) dropped N.P. off, Bergeron took N.P. to the basement, placed her in a portable playpen, and went upstairs for coffee and a restroom break. Bergeron said that when she returned to the basement, she picked N.P. up and bounced her to stimulate her. N.P. nodded off 
2 and Bergeron texted mother asking whether N.P. slept hard. When mother returned to the house, N.P. was lying limp in the playpen. ¶ 6 N.P. was transported to Children’s Hospital, where she presented with seizures and an altered mental state. N.P. was evaluated by Dr. Nicole Wallace, a pediatrician who specializes in child abuse and neglect. During a physical examination of N.P., Dr. Wallace noted a torn frenulum, the piece of tissue that connects the lip to the gum. An initial CT scan and a later MRI showed a subdural hemorrhage on both sides of N.P.’s brain. And a pediatric ophthalmologist found significant retinal hemorrhages in N.P.’s left eye. ¶ 7 Dr. Wallace testified that N.P.’s blood work did not show a bleeding, metabolic, or genetic disorder that could have caused the subdural hemorrhage. Mother told Dr. Wallace that N.P. had been active and eating early that morning. Based on N.P.’s medical history, scans, and blood work, Dr. Wallace formed the medical opinion that N.P.’s injuries were consistent with abusive or nonaccidental head trauma. Dr. Wallace explained that, although she could not say “for certain” whether N.P. had a previous or older injury, given the severity of the injuries, N.P. “would have developed 
3 those symptoms pretty much immediately. There would not have been a long delay of hours to days . . . .” ¶ 8 The prosecution charged Bergeron with child abuse resulting in serious bodily injury, a class 3 felony, in relation to the subdural hemorrhage, and child abuse resulting in injury, a class 1 misdemeanor, in relation to the torn frenulum. After a three-day trial, a jury found Bergeron guilty as charged. The district court sentenced Bergeron to ten years in the custody of the Department of Corrections for the felony child abuse count and a concurrent six months in jail for the misdemeanor child abuse count. II. Expert Witness ¶ 9 Bergeron contends that the district court erred by admitting Dr. Wallace’s expert testimony regarding abusive or nonaccidental head trauma because it was unreliable and unfairly prejudicial. We disagree. A. Additional Background ¶ 10 Before trial, Bergeron moved to exclude any expert testimony (1) using the terms “shaken baby syndrome,” “abusive head trauma,” “acceleration-deceleration,” “whiplash,” or “triad”; (2) implying that the trio of injuries defined as the “triad” — “retinal 
4 hemorrhage, subdural hematoma, and hypoxic/ischemic injury or encephalopathy” — was a diagnostic conclusion of abuse; and (3) suggesting that shaking could be the possible cause of N.P.’s injuries.
1 In response, the prosecution clarified that it was only endorsing Dr. Wallace as an expert to testify about abusive or nonaccidental head trauma and the injuries N.P. sustained. ¶ 11 The district court held a Shreck hearing at which Dr. Wallace testified. She first detailed her training and experience qualifying her to testify as an expert in child abuse and neglect. Bergeron does not dispute Dr. Wallace’s qualifications. ¶ 12 Dr. Wallace then testified that “abusive head trauma” or “nonaccidental head trauma” is a head injury primarily seen in infants and young children that is not the result of an accident or another medical condition. She explained that “shaken baby 1 Bergeron appears to challenge the admission of evidence of “shaken baby syndrome,” “acceleration-deceleration,” “whiplash,” or “triad,” but she does not identify where in the record such evidence was admitted or otherwise develop the argument, instead focusing on Dr. Wallace’s testimony about “abusive head trauma.” Notably, Dr. Wallace testified at the Shreck hearing that she does not use the terms “shaken baby syndrome,” “whiplash,” or “triad.” Because this part of Bergeron’s argument is conclusory and underdeveloped, we decline to address it. See Sanchez v. Indus. Claim Appeals Off., 2017 COA 71, ¶ 41. 
5 syndrome” is an outdated term that has “evolved to abusive head trauma, which is a more inclusive terminology that includes injuries that can be sustained by shaking as well as by impact or a combination of both mechanisms.” She also made clear that a medical determination of abusive or nonaccidental head trauma is different from legal concepts such as intent or identifying who caused a child’s injury. ¶ 13 The doctor testified that the standards used to determine whether an injury is abusive or nonaccidental are informed by medical literature and studies published by other medical professionals. She said there were “too many [studies] to count” related to abusive or nonaccidental head trauma as a medical diagnosis, many of which addressed how to better diagnose such trauma based on the factors, signs, and symptoms. Dr. Wallace explained that there was no way to ethically replicate the injuries in an empirical study (for example, by shaking a group of infants to see how they are injured) to confirm the diagnosis. In response to questioning by the court, she explained that medical professionals follow patients “longitudinally” — meaning they follow patients for a few years — to see if a different medical condition was the actual 
6 cause of the trauma, and she has “not yet seen a case where we missed a diagnosis.” ¶ 14 Dr. Wallace explained the procedures she employs when diagnosing patients. She first reviews the patient’s medical history — from the child, a parent, or medical records — and then conducts a “head-to-toe” physical examination. Based on what she finds during these first two steps, she conducts additional testing such as lab work or radiology studies. ¶ 15 The doctor testified that she considered the following before diagnosing N.P.: the history given by mother that N.P. had been acting normally that morning, including eating and drinking; N.P.’s historically slow weight gain; the scans that showed bilateral subdural hematomas; the significant retinal hemorrhages in N.P.’s left eye; the bruising on N.P.’s forehead; N.P.’s torn frenulum; the blood work that did not show anything abnormal; and the rapid change in N.P.’s mental status and her seizures. Dr. Wallace came to a medical diagnosis that N.P.’s injuries were most consistent with abusive head trauma. ¶ 16 The district court orally ruled at the Shreck hearing that Dr. Wallace’s testimony provided 
7 a firm foundation for the scientific principles regarding how doctors in the field of pediatric medicine, and specifically in child abuse pediatrics, go about trying to discern symptoms that are presented in the course of an examination, patient histories that are provided, and then additional follow-up, as has been pointed out by the prosecution, such as resorting to a review possibly of different types of scans, considering the content of blood work, and various other issues along the lines of a differential diagnosis to rule out possible alternative mechanisms for what may be causing the symptoms to present. The court determined that the lack of replicable studies did not detract from the underlying reliability of the methodology because reliance on clinical data is both ethical and appropriate. The court found that significant literature has been generated about the diagnosis and that most of the disputes revolve around “how the conclusions may be reached as opposed to whether or not the conclusions can be reached.” The court noted “that the standard is not that the scientific principles have to be perfect or wholly infallible or not subject to challenge, but rather reasonably reliable.” Based on that standard, the court ruled that Dr. Wallace’s testimony was admissible. 
8 B. Generally Applicable Law and Standard of Review ¶ 17 CRE 702 allows for the admission of qualified expert testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. The focus of a CRE 702 inquiry is whether the proffered evidence is both reliable and relevant. People v. Shreck, 22 P.3d 68, 77 (Colo. 2001). ¶ 18 To determine the admissibility of expert testimony, a trial court must analyze whether (1) the underlying scientific principles are reasonably reliable; (2) the expert is qualified to offer the testimony; (3) the testimony would be helpful to the jury; and (4) the testimony satisfies CRE 403. People v. Cooper, 2021 CO 69, ¶ 47. Under CRE 403, relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” ¶ 19 A trial court has broad discretion to determine whether expert testimony is admissible, and we “will reverse only when [the court’s] decision is manifestly erroneous.” Cooper, ¶ 44 (quoting People v. Rector, 248 P.3d 1196, 1200 (Colo. 2011)); see People v. Martinez, 74 P.3d 316, 322 (Colo. 2003). In reviewing a trial court’s ruling under CRE 403, “we assume the maximum probative value that a 
9 reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected.” People v. Clark, 2015 COA 44, ¶ 18 (quoting People v. James, 117 P.3d 91, 94 (Colo. App. 2004)). C. The District Court Did Not Err by Concluding the Expert Testimony Was Reliable ¶ 20 Bergeron contends the district court erred by concluding that Dr. Wallace’s expert testimony was reliable because (1) the record lacks medical studies, publications, or witnesses to support that the standards and practices Dr. Wallace uses are proper and generally accepted within the scientific community; (2) the record lacks any articles or publications to suggest the evidence was subject to peer review; and (3) Dr. Wallace relied upon medical history given by mother and the police in diagnosing N.P.’s injury as abusive or nonaccidental. For four reasons, we are not persuaded. ¶ 21 First, Dr. Wallace testified that the standards and practices used to reach the medical diagnosis of abusive or nonaccidental trauma are generally accepted. Dr. Wallace’s testimony is not an external authority, but it is evidence upon which the court can properly rely. See People v. Ruibal, 2015 COA 55, ¶ 29 (“CRE 702 
10 does not require experts to rely on ‘authoritative sources,’ but rather any ‘knowledge, skill, experience, training, or education.’”), aff’d, 2018 CO 93. Bergeron cites no authority requiring the proponent of expert testimony to submit “studies, publications, or supporting witnesses” to establish reliability. Cf. Shreck, 22 P.3d at 77-78 (explaining that a trial court’s determination of the reliability of an expert’s testimony is a “flexible, fact-specific” inquiry with no particular set of factors to consider). ¶ 22 Second, the record shows that the prosecution submitted at least one study that surveyed more than 600 clinicians, cited several other studies and medical publications, and concluded that abusive head trauma is “generally accepted as [a] valid medical diagnos[i]s across a broad range of specialties.” At the Shreck hearing, Dr. Wallace explained that there are no objective measurements or empirical studies related to abusive head trauma because that would require “taking healthy infants and shaking them or abusing them, so obviously we’re not going to do that.” Dr. Wallace also said that medical associations recognize abusive head trauma as a medical diagnosis, including an estimated fifteen organizations across the United States, the United Kingdom, and 
11 Canada. Again, Bergeron cites no authority requiring the proponent of expert testimony to offer a specific number of peer-
reviewed publications before the testimony may be admitted. ¶ 23 Third, Dr. Wallace did not rely solely on the medical history conveyed by mother or the police. She also conducted a physical examination, ordered scans and reviewed the results, and completed blood work. See People v. Ramirez, 155 P.3d 371, 380 (Colo. 2007) (“There is no question that a medical examination is a reliable ‘scientific principle.’”). ¶ 24 Fourth, Bergeron’s contentions go to the weight of the evidence and not its admissibility. See People v. Shanks, 2019 COA 160, ¶ 12 (“Concerns about . . . whether a qualified expert accurately applied a reliable methodology go to the weight of the evidence, not its admissibility.”). The types of issues Bergeron raises are adequately addressed by “vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.” Id. (quoting People v. Campbell, 2018 COA 5, ¶ 42); see Est. of Ford v. Eicher, 250 P.3d 262, 266 (Colo. 2011) (concerns about the degree of certainty of an expert’s opinion should be addressed similarly). Despite her claims that “[t]he 
12 record and evidence establish that the evidence . . . is unreliable because it lacks adequate foundation and evidentiary support,” Bergeron does not point us to any evidence undermining the reliability of the scientific principles underlying Dr. Wallace’s testimony. ¶ 25 Accordingly, we conclude that the district court’s reliability findings are supported by the record and that it did not abuse its discretion by admitting Dr. Wallace’s testimony. See Cooper, ¶ 44; Martinez, 74 P.3d at 322. D. The District Court Did Not Err by Admitting the Evidence Under CRE 403 ¶ 26 Bergeron contends that the district court erred by admitting Dr. Wallace’s expert testimony under CRE 403 because (1) the underlying scientific principles are unreliable; (2) the testimony improperly bolstered the prosecution’s case; and (3) the doctor’s use of the terms “abusive head trauma” and “nonaccidental injury” effectively directed the jury to find Bergeron guilty.
2 We are not persuaded. 2 The parties dispute whether Bergeron preserved these arguments, but because the majority concludes that the district court did not err by admitting the evidence, we need not resolve the dispute. 
13 1. Reliability ¶ 27 We reject Bergeron’s argument that Dr. Wallace’s testimony was unduly prejudicial because the scientific principles underlying it are unreliable because we have already concluded that the evidence is reasonably reliable. See People v. Perkins, 2023 COA 38, ¶ 49 (expert testimony based on reasonable inferences drawn from physical investigation, professional experience, and technical knowledge was not unduly prejudicial where such testimony was both relevant and reliable). 2. Bolstering ¶ 28 Bergeron argues that Dr. Wallace’s testimony improperly bolstered the prosecution’s case because the doctor discussed the heightened standards medical professionals apply when diagnosing abusive or nonaccidental head trauma. Although such testimony certainly bolstered the prosecution’s case and prejudiced the defense, Bergeron fails to explain how those effects were “improper.” ¶ 29 On the contrary, “[a]ll relevant and admissible evidence ‘is inherently prejudicial’” to at least one of the parties. People v. Kembel, 2023 CO 5, ¶ 53 (quoting Masters v. People, 58 P.3d 979, 1001 (Colo. 2002)). And “any evidence that strengthens the 
14 prosecution’s case carries with it some degree of disadvantage to an accused.” People v. Garner, 806 P.2d 366, 375 (Colo. 1991). In recognition of these fundamental evidentiary concepts, CRE 403 only excludes evidence that is unfairly prejudicial. Unfair prejudice refers to “‘an undue tendency on the part of admissible evidence to suggest a decision made on an improper basis’ and does not mean prejudice that results from the legitimate probative force of the evidence.” People v. Rath, 44 P.3d 1033, 1043 (Colo. 2002) (quoting People v. Gibbens, 905 P.3d 604, 608 (Colo. 1995)). ¶ 30 The legitimate probative force of Dr. Wallace’s expert testimony was to establish that N.P.’s injuries resulted from abusive or nonaccidental head trauma — as those terms are used for purposes of medical diagnosis. Her explanation that doctors are “very careful” when making medical diagnoses did not encourage the jury to decide the case on an improper basis “such as bias, sympathy, hatred, contempt, retribution, or horror.” People v. Gonzales, 2019 COA 30, ¶ 34, aff’d, 2020 CO 71. Thus, we perceive no unfair prejudice resulting from Dr. Wallace’s testimony. See Rath, 44 P.3d at 1043. 
15 3. Directing a Guilty Verdict ¶ 31 Bergeron argues that Dr. Wallace’s testimony that “abusive head trauma equates to a non-accidental injury” directed the jury to find Bergeron guilty. While an expert may offer testimony that embraces an ultimate issue to be decided by the trier of fact, see CRE 704, an expert cannot usurp the factfinding function of the jury, see Rector, 248 P.3d at 1203. ¶ 32 At trial, Dr. Wallace testified that a medical diagnosis of “abusive head trauma” was interchangeable with the term “nonaccidental head trauma.” She explained that “abusive head trauma is a category or group of different injuries” generally seen in younger children that occurs “when they sustain a brain injury or a head injury that is not caused by an accident.” The doctor said that such an injury is “traumatic in nature,” not “from falling off the bed or falling off the slide at the playground,” but instead “caused by the actions of another person. So in that sense nonaccidental.” When asked again to define “nonaccidental head trauma,” Dr. Wallace said it is “[e]ssentially another way to say abusive head trauma.” 
16 ¶ 33 But Dr. Wallace also made clear that a medical diagnosis of “abusive head trauma” was different from the legal standards that apply in a criminal case. She explained, [W]hen I diagnose a child with abusive head trauma, that’s strictly from the medical perspective. It’s also important to know that it’s never my job to say who did it. . . . That’s dealt with by law enforcement and [the department of human services] and other professionals who I work alongside, but that’s . . . their domain. ¶ 34 Dr. Wallace neither directed the jury to reach a certain result nor expressed an opinion of the applicable law or legal standards, see Rector, 248 P.3d at 1203; instead, she distinguished her opinion from the ultimate question the jury was tasked with answering. She did not usurp the jury’s factfinding function, and her testimony was not unduly prejudicial for that reason. ¶ 35 Even if Dr. Wallace’s testimony came close to the line, the district court cured any potential prejudice with Instruction 8, which stated: You are not bound by the testimony of a witness who has testified as an expert; the credibility of an expert’s testimony is to be considered as that of any other witness. You may believe all of an expert witness’s testimony, part of it, or none of it. 
17 In this case, you heard evidence from a physician describing injuries purportedly associated with [a]busive [h]ead [t]rauma. The physician’s testimony was admitted because it involved the type of evidence upon which experts in the field of child abuse may rely in order to conclude whether a trauma was [nonaccidental] in nature. This testimony was not a binding legal conclusion of child abuse. You are the sole judges of credibility in this case. You must determine whether the testimony offered by the physician is consistent with or contradicts the other evidence presented to you. The weight you give the testimony is entirely your decision. (Emphasis added.) See id. (a factor to consider in determining whether an expert usurped the jury’s function is whether the jury was properly instructed on the law and that it may accept or reject the expert’s opinion). ¶ 36 Accordingly, we conclude that the district court did not abuse its discretion by admitting Dr. Wallace’s testimony. III. Sufficiency of the Evidence ¶ 37 With respect to both child abuse charges, Bergeron contends that the prosecution presented insufficient evidence that she caused N.P.’s injuries or that she acted knowingly or recklessly. We are not persuaded. 
18 A. Standard of Review and Generally Applicable Law ¶ 38 We review de novo whether the evidence before the jury was sufficient both in quantity and quality to sustain a conviction. McCoy v. People, 2019 CO 44, ¶ 63; People v. Garcia, 2022 COA 83, ¶ 16, rev’d on other grounds, 2024 CO 41M. We view the relevant evidence, both direct and circumstantial, as a whole and in the light most favorable to the prosecution to determine whether it is substantial and sufficient to support a conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt. McCoy, ¶ 63. In doing so, we give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence. Garcia, ¶ 16. “We must leave the determination of the credibility of witnesses to the jury,” and “[w]e may not serve as the ‘thirteenth juror’ to weigh various pieces of evidence or resolve conflicts in the evidence.” Butler v. People, 2019 CO 87, ¶ 20 (citing People v. Sprouse, 983 P.2d 771, 778 (Colo. 1999)). B. The Evidence was Sufficient to Support Bergeron’s Convictions ¶ 39 Under section 18-6-401(1)(a), C.R.S. 2023, [a] person commits child abuse if such person causes an injury to a child’s life or health, or permits a child to be unreasonably placed in a 
19 situation that poses a threat of injury to the child’s life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child. ¶ 40 As relevant here, the culpable mental state for causing injury to a child is “knowingly or recklessly.” § 18-6-401(7)(a)(III), (V). To act “knowingly,” “a defendant need only be aware of the conduct that he is engaging in with the child.” People v. Archer, 2022 COA 71, ¶ 19. To act “recklessly,” a defendant must “consciously disregard a substantial and unjustifiable risk that, given the child’s circumstances, the child may be injured.” Id. ¶ 41 To support the child abuse resulting in serious bodily injury charge, the prosecution presented at least the following evidence: • Mother said that on October 10, N.P. woke up as usual, was drinking milk, jumping, and playing with her toys. • Bergeron testified that N.P. seemed “woozy” and “not stable” when mother dropped her off, but a detective testified that Bergeron had not described anything unusual about N.P.’s behavior when mother dropped her off. 
20 • Bergeron said that N.P. was “cooing and googling” in her playpen, so Bergeron picked N.P. up and tried to play patty-
cake with her. • Bergeron explained that N.P. kept dozing off, so Bergeron tried to stimulate her by bouncing her up and down. Bergeron said that at one point, N.P. was lying down while Bergeron was bouncing her on the bed. Bergeron’s hands were on both sides of N.P. on the bed. • After Bergeron played with N.P., N.P. appeared to fall asleep hard. Bergeron texted mother, “I have never seen her sleep this hard. Does she sleep hard sometimes?” • Mother returned to Bergeron’s house and found N.P. lying on her back, unresponsive. • Mother asked Bergeron to call 911, but Bergeron told mother to take N.P. to the hospital in her own car. Mother had to ask Bergeron a second time to call 911. • A detective estimated that the time between when N.P. was dropped off with Bergeron until the 911 call was about thirty-five minutes. Based on mother’s testimony, N.P. was 
21 at Bergeron’s house for approximately an hour before mother returned. • At the hospital, N.P. presented with seizures and an altered mental state. She suffered subdural hemorrhages on both sides of her brain and retinal hemorrhages in her left eye. Dr. Wallace diagnosed N.P. with abusive head trauma, a nonaccidental injury. • Dr. Wallace testified that the injury that caused N.P.’s seizures and altered mental status did not happen over a period of time. Rather, the symptoms would have developed “pretty much immediately” after the injuries occurred, and “[t]here would not have been a long delay of hours to days if she was being described as acting normally.” ¶ 42 From this evidence, a reasonable jury could infer that N.P. was functioning normally and was uninjured when mother left her in Bergeron’s care. N.P. then suffered abusive head trauma. No one disputes that N.P.’s injuries would constitute serious bodily injury. N.P.’s injuries were not the type of injuries that would result from an accident. And they were so severe they would have resulted in almost immediate symptoms. Viewed in the light most favorable to 
22 the prosecution, this evidence would allow a reasonable jury to find beyond a reasonable doubt that Bergeron committed child abuse resulting in serious bodily injury. See People v. Christian, 632 P.2d 1031, 1033 (Colo. 1981) (expert medical testimony that child’s fatal injuries were nonaccidental, combined with circumstantial evidence that injuries occurred during a time when defendant was alone with the child, was sufficient to support conviction for felony child abuse). ¶ 43 Against this evidentiary backdrop, the jury heard the following facts regarding the child abuse resulting in injury charge: • Bergeron admitted that she injured N.P.’s mouth while feeding her and that the injury caused blood. • Dr. Wallace noted the torn frenulum in N.P.’s mouth. • A detective testified that a torn frenulum is a common injury from force feeding. ¶ 44 From this evidence, a reasonable jury could infer that Bergeron caused N.P.’s torn frenulum while feeding her forcefully. Particularly given the other injuries Bergeron was accused of inflicting on N.P., the jury could have found that Bergeron did so knowingly or recklessly. Viewed in the light most favorable to the 
23 prosecution, this evidence would allow a reasonable jury to find beyond a reasonable doubt that Bergeron committed child abuse resulting in injury. ¶ 45 We are not persuaded otherwise by Bergeron’s contention that there was no evidence that she had a history or pattern of abusive or neglectful conduct. Section 18-6-401(1)(a) is written in the disjunctive, using the word “or” to establish three different ways to commit child abuse. See Armintrout v. People, 864 P.2d 576, 581 (Colo. 1993) (“[W]hen the word ‘or’ is used in a statute, it is presumed to be used in the disjunctive sense, unless legislative intent is clearly to the contrary.”); see also McCoy, ¶ 37 (we interpret a statute de novo). Here, the prosecution alleged that Bergeron knowingly or recklessly caused an injury to N.P. or permitted N.P. to be unreasonably placed in a situation that posed a threat of injury to her. The prosecution was not required to prove that Bergeron had a history or pattern of abusive conduct. See § 18-6-401(1)(a); Armintrout, 864 P.2d at 581. ¶ 46 Bergeron also argues that the evidence presented to prove her guilt was insufficient because it was entirely circumstantial. We acknowledge that the evidence presented to prove Bergeron’s guilt 
24 was largely circumstantial, rather than direct, evidence. See COLJI-Crim. D:01 (2023) (defining “[d]irect evidence” as “based on first-hand observation of the fact in question” and “[c]ircumstantial evidence” as “indirect,” and “based on observations of related facts”). However, circumstantial evidence is afforded the same weight as direct evidence, “and an exclusively circumstantial case need not exclude every reasonable hypothesis other than guilt to withstand a motion for a judgment of acquittal.” Christian, 632 P.2d at1038 (quoting People v. Elkhatib, 632 P.2d 275, 279 (Colo. 1981)); see also People v. Buckner, 2022 COA 14, ¶ 83 (“[I]n determining the sufficiency of the evidence, the law makes no distinction between direct and circumstantial evidence.”). Moreover, evidence of a defendant’s culpable mental state “can rarely be proven other than by circumstantial or indirect evidence.” People v. Mandez, 997 P.2d 1254, 1264 (Colo. App. 1999). ¶ 47 We also note that Bergeron testified at trial, and the jury obviously disbelieved her. See People v. Clark, 214 P.3d 531, 538 (Colo. App. 2009) (Once a jury disbelieves a defendant, it is “entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt.” (quoting Wright v. West, 505 U.S. 277, 
25 296 (1992) (Thomas, J., joined by Rehnquist, C.J., and Scalia, J.))), aff’d on other grounds, 232 P.3d 1287 (Colo. 2010). We cannot substitute our assessment of credibility for that of the fact finder. See id. ¶ 48 We conclude that the evidence was substantial and sufficient to support a conclusion by a reasonable mind that Bergeron was guilty beyond a reasonable doubt. IV. Disposition ¶ 49 We affirm the judgment of conviction. JUDGE FREYRE concurs. JUDGE JOHNSON specially concurs. 
26 JUDGE JOHNSON, specially concurring. ¶ 50 The overwhelming majority of states that have analyzed whether an expert can testify using the terms “nonaccidental head trauma” or “abusive head trauma” have concluded that such terms are admissible. See State v. Hatfield, 484 P.3d 891, 901 (Kan. Ct. App. 2021); State v. Stewart, 923 N.W.2d 668, 676 (Minn. Ct. App. 2019); Sissoko v. State, 182 A.3d 874, 906 (Md. Ct. Spec. App. 2018); Wolfe v. State, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017). And our state is no different. See, e.g., People v. Rector, 248 P.3d 1196, 1203 (Colo. 2011); People v. Weeks, 2015 COA 77, ¶ 88. ¶ 51 Consequently, the majority’s opinion is well reasoned when it holds that the court did not err when Dr. Nicole Wallace (Dr. Wallace) used those terms in her testimony. But as Euripides once wrote in Heracleidae, “In case of dissension, never dare to judge till you’ve heard the other side,” and I am doing my little part to put forth that other side. ¶ 52 Bergeron challenged Dr. Wallace’s testimony on grounds that it was unreliable and irrelevant. On appeal, Bergeron contends that using the terms “nonaccidental” or “abusive” interchangeably to describe a young child’s injury was unduly prejudicial because it 
27 imparts to a jury that “medical experts have already determined that essential elements of the charged offense have been satisfied.” I interpret this argument to be that such testimony usurps the role of the jury. But I agree with the Attorney General that this argument was not made before or at trial. Therefore, while I depart from my colleagues that the testimony was properly admitted, I specially concur in the judgment because the error was not obvious under the current case law, so I cannot say it is reversible error. See People v. Crabtree, 2024 CO 40M, ¶¶ 4, 43 (reaffirming that the elements of plain error are that the error must be “obvious” and it must affect the “substantial rights of the accused” (quoting People v. Stewart, 55 P.3d 107, 120 (Colo. 2002))); Hagos v. People, 2012 CO 63, ¶ 14 (we review unpreserved errors for plain error). ¶ 53 I do not quibble with the general principle that an expert may “offer testimony that embraces an ultimate issue to be decided by the trier of fact.” Rector, 248 P.3d at 1203; see CRE 704. But an expert may not usurp the jury’s factfinding role. Weeks, ¶ 88. The expert must also not “express[] an opinion of the applicable law or legal standards.” People v. Destro, 215 P.3d 1147, 1152 (Colo. App. 
28 2008) (quoting Quintana v. City of Westminster, 8 P.3d 527, 530 (Colo. App. 2000)). ¶ 54 It is generally well settled in Colorado that if an expert’s testimony satisfies the four factors from Rector, the court does not abuse its discretion by admitting the evidence. To determine whether an expert usurped the role of the jury, courts consider whether (1) through cross-examination or closing argument, defense counsel clarified the expert’s testimony; (2) the expert did not testify as to the applicable standard of law or legal standards; (3) the jury was properly instructed on the law to apply and specifically instructed that the jury can reject the expert’s testimony; and (4) the expert did not opine that the defendant committed the crime or that there is a particular likelihood the defendant committed the crime. Weeks, ¶ 89. ¶ 55 We reason that a doctor’s testimony about a victim’s injuries is probative under CRE 403 because the methodologies commonly used by doctors include “(1) examining the patient’s physical condition and injuries; (2) using a process of eliminating various illnesses and diseases to diagnose a patient; and (3) reviewing the patient’s history to determine a possible cause for the patient’s 
29 injuries.” People v. Friend, 2014 COA 123M, ¶ 29, aff’d in part and rev’d in part, 2018 CO 90. In other words, by using the victim’s medical history, the prosecution uses the doctor’s testimony to refute when a defendant claims that her actions were accidental. And such evidence is not unduly prejudicial “because it would not ‘move the jury to any sort of irrational behavior, that they would use [the doctor’s] testimony to bring in a verdict based on improper motive or anything of the like.’” Id. at ¶ 33. ¶ 56 Consistent with this methodology, Dr. Wallace explained that “abusive head trauma” is often found in children or infants, two years or younger, who have sustained “a brain injury or head injury that is not caused by an accident.” She further explained that the injury is not caused by “falling off the bed or falling off the slide at the playground or something like that.” Instead, “[i]t is an injury caused by the actions of another person.” ¶ 57 She further explained that when a baby is shaken, the acceleration and deceleration results in the brain “bouncing around inside the skull.” In contrast, if a baby falls off the bed, the head injury manifests differently because the infant “fall[s] straight down on the floor.” Thus, according to Dr. Wallace, nonaccidental head 
30 trauma and abusive head trauma are essentially the same thing, meaning the trauma did not happen from a “typical childhood accident.” ¶ 58 Dr. Wallace based her expert opinion, in part, on what was known of N.P.’s medical history, the mother’s version of events the morning of the incident, and the severity of the injuries N.P. sustained. Taking all this together, Dr. Wallace opined that N.P.’s injuries were inconsistent with Bergeron’s statements that Bergeron had been bouncing the baby on the bed. ¶ 59 As the majority notes, Dr. Wallace testified that the terms “nonaccidental” or “abusive” head trauma are medical diagnoses that are unrelated to the legal standard. Supra ¶ 33. Dr. Wallace also testified that she has never opined on whether a parent or another caregiver might have caused the injury. Supra ¶ 33. And the jury was instructed before Dr. Wallace’s testimony and with jury instructions that it could reject her testimony. Therefore, we presume the jury followed the instructions. See People v. Garcia, 2021 COA 79, ¶ 20. And because the jury had to determine whether Bergeron committed the abuse, Dr. Wallace’s testimony that embraced an ultimate legal issue was allowed to be offered so 
31 long as it did not usurp the jury’s role. See Rector, 248 P.3d at 1203. ¶ 60 But the Rector factors condone the use of these terms as a matter of course. Going through them, though — especially in a case like this where the mother had not been away from the child for a significant period of time when Bergeron was alleged to have committed the abuse — demonstrates how these terms inappropriately usurp the role of the jury. ¶ 61 First, Rector says that if defense counsel clarifies the terminology on cross-examination, the phrasing is likely admissible. Id. But why have we established a test that puts any burden on the defense to clarify evidence the prosecution seeks to admit? Is it not true that the prosecutor always retains the burden of proof and that the defendant could simply sit at counsel table and not present a defense at all? Indeed, this point was made in closing argument when the prosecutor said that Bergeron was not willing to tell the jury what had happened to N.P. The court sustained defense counsel’s objection and specifically said, Ladies and gentlemen, the silence of the defendant is something that is sacred in a court of law, and in a criminal case the 
32 Defense is never required to put on evidence or to provide particular testimony. In this case, the defendant did testify. But I don’t want you to mistake that for meaning that the Defense took on some burden of producing particular evidence in this case. Therefore, I would change the first Rector factor to be that if the prosecutor chooses to elicit expert testimony that the child’s injury was “abusive” or “nonaccidental,” it is the prosecutor’s responsibility to clarify the medical definition for the jury. See People v. Keck, No. 346077, 2022 WL 128582, at *10 (Mich. Ct. App. Jan. 13, 2022) (unpublished opinion) (“It was the prosecution’s burden to prove that CK’s injuries were nonaccidental, but defendant did not have a burden to prove an accidental injury.”). ¶ 62 Here, Dr. Wallace said that nonaccidental head trauma is “an injury that is caused by the actions of another person.” If she had left her testimony there, then my issue with these terms — while still finding them problematic — would be diminished. But she went on to say, “So in that sense [it is] nonaccidental.” At another point in her testimony, Dr. Wallace said abusive head trauma is “not the result of an accident.” And yet another colloquy between 
33 Dr. Wallace and the prosecutor did nothing to amplify the medical terminology’s distinction from its use as a legal term: Q: Did you form an opinion as to whether or not these injuries were accidental? A: Yes. Q: What was that opinion? A: Again, abusive head trauma or nonaccidental trauma. ¶ 63 There is a way to identify a child’s injury with less inflammatory language. In 2009, the American Academy of Pediatrics adopted the term “abusive head trauma” to mean the “constellations of injuries that are caused by the directed application of force to an infant or young child, resulting in physical injury to the head and/or its contents.” People v. McFarlane, 926 N.W.2d 339, 349 (Mich. Ct. App. 2018) (quoting Sissoko, 182 A.3d at 900). One court has described it as “a medical diagnosis, which ‘by definition . . . involves trauma caused by human agency.” State v. Galvez, No. CAAP-18-0000417, 2019 WL 2296252, at *7 (Haw. Ct. App. May 30, 2019) (unpublished opinion) (quoting McFarlane, 926 N.W.2d at 349). And another has said it is head “trauma that is inflicted on a child.” In re MaKenna S., No. H14CP10010201A, 
34 2011 WL 4447225, at *10 (Conn. Super. Ct. Aug. 31, 2011) (unpublished opinion). All these descriptions adequately inform the jury of the medical diagnosis that the child was injured by some type of human involvement instead of circumstances where a child fell off the slide or tripped down the stairs. But these descriptions do so without imparting an intentional component to the human’s conduct. ¶ 64 This leads me to the second Rector factor: the doctor did not testify as to the applicable standard of law or legal standards. What exactly does this mean? If a doctor says she does not know what the legal standard is because, as Dr. Wallace said here, she leaves that to law enforcement and the department of human services, how does the jury know that the medical professional is not equating a medical diagnosis with a legal standard or definition? ¶ 65 When a doctor opines that a child’s head trauma was “abusive” or “nonaccidental,” this is akin to legal terms that go to the actus reus and mens rea of a criminal offense. See Keith A. Findley et al., Feigned Consensus: Usurping the Law in Shaken Baby Syndrome/Abusive Head Trauma Prosecutions, 2019 Wis. L. Rev. 1211, 1246 (2019). Such an opinion satisfies the actus reus 
35 requirement by telling us that “someone applied violent force to harm the child”; and it satisfies the mens rea requirement because “if the injury is inflicted or the result of abuse, then the caregiver acted not accidentally, but with a guilty mind.” Id. at 1246-47. ¶ 66 An expert’s conclusion that a child’s injuries were “abusive” is a “quintessentially legal question[], not [a] medical question[].” Id. at 1247. Indeed, legally, “if the injury is inflicted, the child might be removed from the parents, or the caregivers might be prosecuted criminally,” whereas medically, “there is no difference in treatment for the brain injuries a child suffers depending on whether any trauma the child suffered was applied intentionally (inflicted) or accidentally.” Id. ¶ 67 My point is strengthened by reference to a specific statute that uses similar terms. In the Colorado Children’s Code, “[e]vidence that child abuse or nonaccidental injury has occurred shall constitute prima facie evidence that such child is neglected or dependent, and such evidence shall be sufficient to support an adjudication under this section.” § 19-3-505(7)(a), C.R.S. 2023 (emphasis added). If a court were asked to interpret the meaning of those italicized words, it would first look to the plain and ordinary 
36 meaning of those words. People v. Burgandine, 2020 COA 142, ¶ 6. “Abuse” means “physical maltreatment.” Merriam-Webster Dictionary, https://perma.cc/Z47L-56H6. The definition of “nonaccidental” is “not accidental, intentional.” Collins Dictionary, https://perma.cc/S5YV-XBY5. Based on these definitions, it is not a huge leap for a court conducting statutory interpretation to equate “nonaccidental” injury and abusive head trauma with intentional conduct. And yet we are asking a jury not to make such a distinction? ¶ 68 As Bergeron points out, the word “nonaccidental” or a variation thereof appears in the record over twenty times. And in closing argument, the prosecutor said, “[W]ith regard to the abusive head trauma, [Dr. Wallace] said this is traumatic in nature. It’s not accidental.” Thus, the prosecutor used the medical terminology to support that they had proved the mens rea element of the offense. ¶ 69 Lack of clarity on the medical term’s distinction from the legal standard takes me to Rector’s third prong: whether the jury was properly instructed on the law of the offense and that it may accept or reject the expert’s opinion. This prong is toothless if the jury has heard that “abusive” or “nonaccidental” head trauma is intentional 
37 conduct, as diagnosed by a medical professional. At the very least, a court’s limiting instruction should also include a statement that the medical meaning of “abusive” or “nonaccidental” head trauma does not at all define the cause of injury or signify whether the child’s injuries were caused knowingly or recklessly (the levels of intent at issue in this case). ¶ 70 Rector’s fourth factor can, like in this case, be problematic. Even if the expert does not directly call out the defendant as the perpetrator, the expert’s testimony can implicitly point to a specific person. True, as the majority mentioned above, Dr. Wallace said she never opines on who might have committed the abuse and that such a function is not her job. But she also testified that much of her diagnosis was based on the medical history provided to her from the mother, who she credited, and that she had not talked with or reached out to Bergeron. See People in Interest of J.R., 2021 COA 81, ¶ 32 (finding that although the doctor’s testimony was impermissibly admitted because it indirectly pointed to the defendant as the perpetrator of the sexual assault, admission of the evidence did not constitute plain error). 
38 ¶ 71 I understand that it is not the medical professional’s responsibility to investigate and track down who had access to the child before the injury in order for them to come to a medical diagnosis. But if we allow experts to use such terms as “nonaccidental” or “abusive head trauma,” the jury should be aware that those terms are limited to information that may lead doctors to an erroneous medical diagnosis because they do not have all the evidence. Defense counsel points out that the prosecutor bolstered the doctor’s testimony by allowing Dr. Wallace to testify about how “careful” medical professionals are before making a diagnosis of “nonaccidental head trauma.” But in cases where the child was in the care of a third party, the parent or family member who takes the child to the hospital is likely to diminish any role played in the child’s injuries. Thus, we should limit, not boundlessly allow, experts’ use of diagnostic terms that impart intentional conduct because this “purports to establish that the person with the child at or very near the time of the collapse or onset of major symptoms must have been the one who harmed the child.” Findley et al., 2019 Wis. L. Rev. at 1248. This implied foregone conclusion of the abuser is especially unfair in circumstances where a short time 
39 elapsed between the child’s asymptomatic state and symptomatic decline. ¶ 72 Bergeron testified that on the day in question, (1) N.P.’s mother called her at 8:52 a.m. to drop N.P. off at Bergeron’s house; (2) N.P.’s mother left Bergeron’s house between 8:58 and 9 a.m. after dropping N.P. off; (3) N.P., although initially “cooing and googling,” became unconscious shortly thereafter; (4) Bergeron texted N.P.’s mother at 9:19 a.m. that N.P. was not waking up; (5) N.P.’s mother returned to Bergeron’s house and starting shaking N.P. to wake her up; (6) Bergeron called 911; and (7) the paramedics arrived around 9:26-9:27 a.m. ¶ 73 Much of this timeline was corroborated by the mother’s testimony. She testified that soon after waking up that morning between 6 and 6:30 a.m., N.P. was “jumping, playing with her toys.” Between 7 and 7:30 a.m., mother left to go drop N.P. off at Bergeron’s house, arrived at 7:58 a.m., and was there for about five minutes before leaving. In response to Bergeron later telling her that N.P. was not waking up, mother called Bergeron at 8:52 a.m. and returned to Bergeron’s house. Upon her return, mother tried 
40 waking N.P. up by pinching her and patting her back, and she asked Bergeron to call 911, which Bergeron did. ¶ 74 All this leads me to conclude that under the current Rector formulation, Dr. Wallace’s use of the terms “nonaccidental” and “abusive head trauma” should not have been admitted. The prosecutor was given a leg up in allowing an expert to opine on not just the type of injury, but the mens rea level of the offense under the guise of a medical diagnosis. ¶ 75 But I also conclude that the impermissible testimony was not plain error because it was not obvious. See Hagos, ¶ 14. Recently, our supreme court reaffirmed that “the plainness prong demands that the error be ‘so clear-cut, so obvious,’ a trial judge should be able to avoid it without benefit of objection.” Crabtree, ¶ 42 (quoting Romero v. People, 2017 CO 37, ¶ 6). Thus an error is obvious when it contravenes “(1) a clear statutory command; (2) a well-settled legal principle; or ([3]) Colorado case law.” People v. Sloan, 2024 COA 52M, ¶ 34 (quoting People v. Pollard, 2013 COA 31M, ¶ 40). The error here was not obvious given the current state of the law. As discussed above, many courts, including in Colorado, have held that a medical professional’s use of such terms 
41 is admissible. The Colorado cases follow the test in Rector, a supreme court decision, and this court is bound by that precedent. See People v. Smith, 183 P.3d 726, 729 (Colo. App. 2008). Thus, when “Colorado statutory law or case law would not have alerted the trial judge to an unobjected-to error, the error cannot be deemed plain.” Crabtree, ¶ 42. Given the supreme court’s unambiguous directive that plain error must be both obvious and substantial, Bergeron’s failure to satisfy the first prong forecloses a finding of reversible error. ¶ 76 Accordingly, I disagree with Part II of the majority opinion but concur in the judgment.